Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis, North Carolina, 2012 NCBC 48.

STATE OF NORTH CAROLINA

ROWAN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 1172

TIME WARNER ENTERTAINMENT
ADVANCE/NEWHOUSE
PARTNERSHIP,

          Plaintiff,

   v.

TOWN OF LANDIS, NORTH
CAROLINA,

          Defendant.

ORDER & OPINION

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Reid L. Phillips; Hogan Lovells, LLP by Gardner F. Gillespie and Paul A. Werner, III for Plaintiff.*

*Poyner Spruill, LLP by David M. Barnes and Andrew H. Erteschik for Defendant.*

*The Bussian Law Firm, PLLC by John A. Bussian for the North Carolina Cable Telecommunications Association, Amicus Curiae.*

*Nelson Mullins Riley & Scarborough, LLP by Joseph W. Eason, Christopher J. Blake, and Phillip A. Harris for the North Carolina Association of Electric Cooperatives, Amicus Curiae.*

*ElectriCities of North Carolina, Inc. by W. Mark Griffith, Amicus Curiae.*

Murphy, Judge.

{1}    **THIS MATTER** is before the Court as a "dispute" between Plaintiff Time Warner Entertainment Advance/Newhouse Partnership ("TWEAN") and Defendant Town of Landis, North Carolina ("Landis," or the "Town") concerning rates, terms, and conditions for attachment of TWEAN communications infrastructure to Landis' municipally-owned utility poles, pursuant to North Carolina General Statutes section 62-350 (the "Statute").

{2}     Having considered the evidence presented by the parties at trial; the parties' pre- and post-trial briefings; the briefings of amici; and the arguments and contentions of counsel, the Court determines that the "issues in dispute" advanced by TWEAN regarding the specific terms of Landis' proposed new pole attachment agreement fail to confer subject matter jurisdiction upon the Court. Accordingly, the Court hereby **DISMISSES** Plaintiff's action without prejudice.

I.

PROCEDURAL BACKGROUND

{3}     TWEAN filed its Verified Complaint on April 19, 2010, to resolve a dispute with Landis concerning the rates, terms, and conditions of TWEAN's attachment of its telecommunications transmission cables to utility poles owned by Landis. TWEAN alleges that: (1) Landis refused to negotiate in good faith the terms of a new pole attachment agreement between the parties; (2) Landis' proposed attachment terms violate the Statute's nondiscrimination requirement; and (3) the specific terms of Landis' proposed new attachment agreement are "unjust and unreasonable."[1]

{4}     Pursuant to N.C. Gen Stat. § 62-350(c), TWEAN identifies in its Complaint three specific "issues in dispute," and asks the Court to determine whether: (a) Defendant's proposed rental rate of $18.00 per attachment is an unreasonable and unjust rate; (b) Defendant's proposal to charge the Plaintiff the $18.00 rental rate separately for "any one cable that is physically attached to a pole by means of a through bolt" is unreasonable and unjust; and (c) Defendant's proposed provisions and fines concerning non-conforming attachments set forth in Section 6(e) of its proposed new contract are unreasonable and discriminatory terms.

---

[1] TWEAN characterizes as unjust and unreasonable: (i) Landis' requested annual attachment rate of $18.00 per cable attachment; (ii) Landis' "per-cable" (as opposed to "per-pole") basis for assessing this proposed $18.00 annual attachment rate; and (iii) Landis' $15.00-per-day fine for safety violations caused by TWEAN's non-compliant pole attachments existing after Landis provided TWEAN with thirty days' notice of such violations.

{5} Consistent with its "issues in dispute," TWEAN prayed for the following specific relief:

1. Declare Defendant's proposed $18.00 rate unreasonable and either establish a rate in conformance with N.C. [Gen. Stat.] § 62-350 or provide guidance on how a proper rate should be determined under N.C. [Gen. Stat.] § 62-350;

2. Declare that, consistent with precedent under federal law, Defendant's pole rate shall be based on its pole-related costs in the same manner as set by the Federal Communications Commission pursuant to 47 U.S.C. § 244;

3. Declare that, consistent with precedent under federal law, Defendant's unit charge is unreasonable, as additional attachments do not increase pole-related costs.

[4.] Declare Defendant's proposed terms regarding non-conformance of attachments unreasonable to the extent that it [sic] imposes onerous and discriminatory fines on Plaintiff for alleged safety violations, does not allow sufficient time for Defendant to cure identified safety violations, does not clearly exempt Defendant from being subject to fines for violations created by other parties, and does not provide a means of recourse to settle disputes concerning the cause of violations[.]

(V. Compl. 15.)[2]

{6} The case was designated as a mandatory complex business case on April 21, 2010, and assigned to this Court on April 22, 2010.

{7} Landis filed its Answer on June 4, 2010, praying, in part, that the Court:

2. Declare that [TWEAN] has failed to meet its burden under N.C. Gen. Stat. § 62-350 because the Town's proposed rates for pole attachments are reasonable;

---

[2] Despite the confinement of TWEAN's prayer for relief to these enumerated declarations (along with a catchall prayer for "such other relief as the Court deems just and proper") (V. Compl. 15), counsel for TWEAN stated in closing argument at trial that "[i]t's simply up to this Court to *set the rate*" to be paid by TWEAN for its pole attachments in Landis, pursuant to a proposed new pole attachment agreement between the parties. (Trial Tr. 637 (emphasis added).)

3. Declare that, pursuant to the plain language and legislative intent of N.C. Gen. Stat. § 62-350, North Carolina law expressly rejects the use of the FCC formula as the exclusive means of determining rates for pole attachment contracts with municipalities, and expressly allows and encourages municipalities to adopt rate structures other than the FCC formula;

4. Declare that N.C. Gen. Stat. § 62-350 allows unit charges for overlashed pole attachments, which impose demonstrable burdens on utility poles and their owners;

5. Declare that [TWEAN] has failed to meet its burden under N.C. Gen. Stat. § 62-350 because the Town has proposed reasonable terms regarding remedies for [TWEAN's] safety violations;

6. Declare that [TWEAN] has failed to meet its burden under N.C. Gen. Stat. § 62-350 because the Town had proposed nondiscriminatory rates and terms for its pole attachment contract with [TWEAN].

(Answer 8.)

{8}     On June 22, 2010, the North Carolina Association of Electric Cooperatives ("NCAEC") moved to intervene in this action pursuant to Rule 24 of the North Carolina Rules of Civil Procedure. The Court denied NCAEC's Motion to Intervene on August 17, 2010, instead permitting NCAEC to submit briefs as *amicus curiae*.

{9}     ElectriCities of North Carolina, Inc. ("ElectriCities") moved for permission to participate in the case as *amicus curiae* on August 25, 2010, which the Court granted on September 21, 2010.

{10}    The North Carolina Cable Telecommunications Association ("NCCTA") moved for permission to participate in the case as *amicus curiae* on January 26, 2011, which the Court granted on February 15, 2011.

{11}    On December 20, 2010, Landis filed its Motion for Partial Summary Judgment as to TWEAN's claims for failure to negotiate and for discrimination. TWEAN filed its response on January 27, 2011; Landis filed its reply brief on February 9, 2011; and the Court heard oral arguments on February 17, 2011.

{12}    By its June 30, 2011, Order and Opinion, the Court granted Landis'
Motion for Partial Summary Judgment as to TWEAN's claim for failure to
negotiate, and denied the Motion as to the discrimination claim. *See Time Warner
Entm't Advance/Newhouse P'ship v. Town of Landis*, 2011 NCBC 19 ¶ 66 (N.C. Sup.
Ct. June 30, 2011), http://www.ncbusinesscourt.net/ opinions/2011_NCBC _19.pdf
(granting defendant's motion for partial summary judgment as to plaintiff's claim of
failure to negotiate, and denying the motion as to plaintiff's claim of
discrimination).

{13}    The Court conducted a bench trial on TWEAN's discrimination claim
and the remaining "issues in dispute" from July 18 to July 21, 2011.  At the close of
TWEAN's evidence, the Court denied Landis' Motion for Directed Verdict regarding
the "issues in dispute," but reserved its ruling as to the discrimination claim.  (Trial
Tr. 494, 634.)[3]  At the close of all evidence, the Court again denied Landis' Motion
for Directed Verdict as to the "issues in dispute" and TWEAN withdrew its
discrimination claim, leaving only the disputed terms of Landis' proposed
attachment agreement for the Court to resolve.

{14}    On June 19, 2012, the Court notified the parties of the Court's
concerns about two questions of law: namely, the justiciability of the three "issues in
dispute," and the constitutionality of the Statute with respect to certain
requirements the Statute imposed upon the Court.  The parties, and amici curiae
NCCTA and NCAEC, briefed the Court on these two matters,[4] and the Court
conducted a hearing on July 17, 2012, during which the parties and participating

---

[3] In ruling on the first of Landis' Motions for Directed Verdict, the Court reserved its ruling
as to the discrimination claim.  (Trial Tr. 494.)

[4] In its supplemental post-trial briefing, TWEAN argues that the issue of constitutionality
is not properly before the Court because it was not raised by a party at any time during
these proceedings.  (Pl.'s Resp. to Jurisdictional Questions 10 (quoting *State v. Fredell*, 283
N.C. 242, 247, 195 S.E.2d 300, 303 (1973) ("Before deciding an act unconstitutional the
question must be presented squarely by a party whose rights are directly involved."
(internal citations omitted))).  In light of the ultimate resolution of the matter before the
Court, however, it is unnecessary for the Court to address any issue of constitutionality
that may or may not be raised by the application of N.C. Gen. Stat. § 62-350 to the facts of
this case.

amici responded to specific questions from the Court and presented additional arguments.

## II.
## FINDINGS OF FACT

{15}    The Court makes findings of fact pertinent to the Court's determination of subject matter jurisdiction over the claims remaining for adjudication.

{16}    Landis is a North Carolina municipal corporation located in Rowan County.  At all times relevant to this action, Landis owned and operated a municipal utility that provides electric service to residents within, and surrounding, the Town limits.  The physical plant supporting the Town's utility service includes an extensive network of utility poles.  (Trial Tr. 137.)

{17}    TWEAN is successor in interest to Vision Cable Communications, Inc. ("Vision Cable"), and provides cable television and broadband services within the Town.  (Trial Tr. 56–57, 63, 65.)  TWEAN's business model, and that of its predecessor Vision Cable, relies upon access to utility poles, including poles owned by Landis, for delivery of services to customers.  (Trial Tr. 63–65.)  Vision Cable first introduced its cable television services to Landis in 1979.  (Trial Tr. 63.)  Vision Cable and Landis entered into a written pole attachment agreement on June 16, 1984 (the "1984 Agreement," or "Agreement").  (Pl.'s Trial Ex. 8.)

## A.
## THE 1984 AGREEMENT

{18}    Under the terms of the 1984 Agreement, Landis granted a license to Vision Cable to attach transmission cables to Landis' utility poles at a rate of $3.00 per pole per year, with an additional charge of $1.00 per year for each metered power supply attachment, to be paid semi-annually.  (Pl.'s Trial Ex. 8 ¶ 8.)  Each Vision Cable pole attachment was to be subject to Landis' permitting requirements,

and was limited to one cable attachment per pole, with attachment approval in the Town's sole discretion. (Pl.'s Trial Ex. 8 ¶ 1a.) Vision Cable was to place permanent identification markers on all attached appliances that would be uniform, clearly visible, and recognizable from the ground. (Pl.'s Trial Ex. 8 ¶ 1b.) Costs associated with the maintenance of attachments, or changes required to safely support Vision Cable's attachments, were to be borne by Vision Cable. (Pl.'s Trial Ex. 8 ¶ 2.) All Vision Cable attachments were to comply with standards set forth in the National Electrical Safety Code ("NESC") and any applicable state regulatory requirements. (Pl.'s Trial Ex. 8 ¶ 3.) Landis reserved the right, under the Agreement, to refuse to permit pole attachments for solely aesthetic reasons, i.e., where such attachments would prove "unsightly" in the Town's opinion. (Pl.'s Trial Ex. 8 ¶ 3.) The Town, furthermore, could immediately terminate any existing pole attachment permits and require removal of such attachments if it determined that use of particular poles was "forbidden by Municipal authorities or property owners." (Pl.'s Trial Ex. 8 ¶ 13.) The Agreement also included provisions indemnifying the Town and requiring Vision Cable to carry insurance as specified. (Pl.'s Trial Ex. 8 ¶ 10.) The Agreement further contemplated that Vision Cable's use of Landis' poles was not to confer upon Vision Cable any ownership or property rights. (Pl.'s Trial Ex. 8 ¶ 19.)

{19}     The term of the 1984 Agreement was for a period of "not less than one (1) year" from the date of execution. (Pl.'s Trial Ex. 8 ¶ 20b.) The Agreement specified that termination could occur by: (i) either party "at the end of said year or at any time thereafter . . . giving . . . the other party at least six (6) months' written notice" (Pl.'s Trial Ex. 8 ¶ 20b); (ii) Vision Cable's failure to correct any default or noncompliance with the terms of the Agreement within thirty (30) days, including nonpayment of bills "for expenses and other charges" (Pl.'s Trial Ex. 8 ¶ 14); or (iii) Vision Cable's failure "to install its cables and appliances throughout [the specified] area within one year from execution" of the Agreement. (Pl.'s Trial Ex. 8 ¶ 20a.)[5] The Agreement expressly provided that it would "extend to and bind the successors

_____

[5] Such failure would also permit the Town to partially terminate the Agreement as to any affected poles. (Pl.'s Trial Ex. 8 ¶ 20a.)

and assigns of the parties," (Pl.'s Trial Ex. 8 ¶ 23), and that "[f]ailure to enforce or insist upon compliance with any of the terms or conditions of this [A]greement shall not constitute a general waiver or relinquishment of any such terms or conditions, but the same shall be and remain at all times in full force and effect." (Pl.'s Trial Ex. 8 ¶ 16.)

{20} The Agreement has never been terminated (Trial Tr. 161), there is no evidence before the Court that either party has ever given notice of termination for any reason, and the parties agree that they continue to operate under the terms of the Agreement. (Trial Tr. 119; Def.'s Post-Trial Br. 9 (citing Trial Tr. 120).) Landis has never enforced the fining provision of the Agreement with respect to any NESC violations, and has never denied TWEAN permission to attach to any poles. (Trial Tr. 182–83.) The Town has, furthermore, never billed TWEAN for costs associated with any new poles. (Trial Tr. 182–83.)

B.

THE PROPOSED NEW AGREEMENT

{21} In 2008, the Town engaged McGavran Engineering, led by principal Larry McGavran ("McGavran"), to conduct an audit of the Town's pole plant and to negotiate a new pole attachment agreement directly with TWEAN. (Trial Tr. 140, 374.) McGavran had more than ten years of experience with municipal pole attachments.

{22} McGavran completed the pole audit by November 2008. (Trial Tr. 154.) Per the audit, Landis had an inventory of approximately 3,000 poles, and TWEAN had approximately 2,100 attachments to 1,594 of those poles. (Trial Tr. 102, 109; Def.'s Trial Ex. 12.) The audit further reflected 946 safety or technical violations of varying degrees related to TWEAN's attachments. (Trial Tr. 156.)

{23} McGavran and his staff began to develop a draft of a proposed new agreement (the "Proposed Agreement") to govern TWEAN's attachment to Landis' poles. McGavran submitted a preliminary draft agreement to the Town on October 6, 2008. (Pl.'s Trial Ex. 10.) McGavran also drafted a proposed amendment to the Town's municipal pole attachment ordinance (Trial Tr. 358) that was adopted by the

Town on March 9, 2009.  (Pl.'s Trial Ex. 15.)  Among other things, the proposed amendment authorized the Town to impose, in its discretion, a default pole attachment rate of $50 per year for each attachment of any "telecommunications and cable television provider" that did not sign a "Town approved contract to maintain attachments to the same poles" by April 9, 2009.  (Pl.'s Trial Ex. 15.)

{24}    Despite the incorporation of this provision in the Town's amended pole ordinance, McGavran did not forward the Proposed Agreement to TWEAN until August 2009, because he was waiting for the results of the legislative process that ultimately yielded the Statute.  (Trial Tr. 141–42, 310.)

{25}    Between October 2008 and August 2009, McGavran Engineering revised the Proposed Agreement and submitted the revisions to Landis Town Administrator Reed Linn ("Linn") and Landis Director of Public Works Steve Rowland for their review in July 2009.  (Trial Tr. 308.)  The Proposed Agreement, as revised, provided for an initial term of one year, to be automatically renewed for successive one-year terms unless either party gave written notice of their intent to terminate not less than ninety days prior to the end of any current term. (Pl.'s Trial Ex. 9 § 14.)  The attachment rate (the "rental rate"), set out in Schedule 1 attached to the Proposed Agreement, was $18 per attached cable for the first year (i.e., 2009). Thereafter, the proposed rate would increase by $1.40 per year for each subsequent year of the proposal (i.e., 2010 through 2014).  (Pl.'s Trial Ex. 9, Schedule 1.)[6]  In addition, the Proposed Agreement provided for multiple charges per pole where TWEAN's attachments "overlashed" more than one cable per single point of attachment.  (Pl.'s Trial Ex. 9 § 1.)  The Proposed Agreement also included a $10-per-pole permitting fee and a $15-per-day penalty, upon 30 days written notice of violation by the Town, for any attachment that failed to comply with NESC and Occupational Safety and Health Administration ("OSHA") requirements or that did not conform to certain technical specifications.  (Pl.'s Trial Ex. 9 §§ 4, 6(c), 6(e).)

---

[6] The 2009 rate reflected in the earlier (October 2008) draft of the Proposed Agreement was $10.10 per attachment, with $1.10-per-year increases to follow for each subsequent year through 2014.  (Pl.'s Trial Ex. 10, Schedule 1.)

{26}    McGavran drafted a letter to TWEAN, signed by Linn, that was forwarded to TWEAN on August 3, 2009, along with the Proposed Agreement. (Trial Tr. 141–42.)  The letter stated that "[the Town] expect[s] this document [i.e., the Proposed Agreement] to be executed within 30 days of receipt of this letter.  If this does not occur, we will charge you the default rate as stated in our pole attachment ordinance passed last spring." (Pl.'s Trial Ex. 23.)  The letter also drew TWEAN's attention to the Proposed Agreement's revised definition of the applicable pole attachment unit charge from per-pole to per-cable, explaining that "[t]his is in line with standard procedures within the industry for those attaching entities that do not own poles." (Pl.'s Trial Ex. 23.)  The letter also promised that McGavran would forward to TWEAN the results of an inventory of "poles, attachments, violations and other items" within 10 business days (i.e., by August 17, 2009).  (Pl.'s Trial Exs. 23–24.)  McGavran forwarded a summary of the pole inventory to TWEAN on August 27, 2009.  (Def.'s Trial Ex. 12; Trial Tr. 395.)

{27}    In a letter to Linn dated August 31, 2009, Nestor Martin (TWEAN Senior Director of Construction for the Carolinas), invoked the Statute and advised the Town to "treat this letter as a request under Section 62-[350](b) to negotiate a new pole agreement, to include a just, reasonable and non-discriminatory rate." (Pl.'s Trial Ex. 25.)  Martin noted that Landis had failed to provide specific information regarding the 946 violations attributed by McGavran to TWEAN's existing attachments to the Town's poles, and requested certain cost and valuation data regarding Landis' pole plant and electric service for purposes of evaluating the attachment rate included in the Proposed Agreement.  (Pl.'s Trial Ex. 25.)  TWEAN later obtained from the Town an editable version of the Proposed Agreement and created its own redlined version that reflected deletions of Landis' proposed attachment rates.  (Pl.'s Trial Ex. 26.)  TWEAN forwarded the redlined version to the Town.

{28}    At trial, McGavran indicated that Schedule 1's $18-per-cable attachment rate was advanced to TWEAN "for negotiation purposes," (Trial Tr.

328–329),[7] and included $2.40 above a rate calculated by McGavran and his team. (Trial Tr. 337–40.)[8] McGavran represented to the Court that the $1.40-per-year rate increases expressed in the Proposed Agreement were also included for "negotiation purposes." (Trial Tr. 328.) McGavran testified that the actual rate that might have resulted from the negotiation could well have varied from the $18 rate, stating that "[w]e could have agreed on something under that, I would think. It could have been higher as well, could have moved either way." (Trial Tr. 329.)[9]

{29} Neither party presented evidence to the Court that the Landis Town Board, or Linn in his capacity as Town Manager, ever acted to bind the Town to the rates propounded in the Proposed Agreement, or that McGavran was authorized to execute binding agreements on Landis' behalf. (See Trial Tr. 144 (Reed Linn, confirming that "there was no formal approval of the draft agreement by the [Landis] [T]own [B]oard").) When pressed at trial about who made decisions regarding terms of the proposed contract - McGavran individually or the Town itself - McGavran characterized himself as "a contract employee of the Town," charged by Landis with the task of negotiating directly with TWEAN. (Trial Tr. 341.) In addition, Linn specifically testified that the Town never formally voted on the "McGavran rate" because "we came into a lawsuit." (Trial Tr. 185.)

{30} Notwithstanding its August 2009 letter to TWEAN threatening imposition of the $50 default rate provision of its pole ordinance amendment, no evidence was presented to the Court that Landis has ever sought to enforce the $50 default rate. The 1984 Agreement has never been terminated (Trial Tr. 161), and,

---

[7] In setting the rate for the Proposed Agreement, McGavran testified that he took into account the thirty-year period during which TWEAN's attachments to Landis' poles were permitted at the rate of $3 per pole, a rate McGavran viewed as "unreasonably low." (Trial Tr. 341–42.)

[8] The trial testimony of McGavran and McGavran Engineering employee John Talbert showed that, in developing the rate included in the Proposed Agreement, Talbert calculated a rate of $15.60 based on pole plant and other financial information obtained from the Town. (Trial Tr. 267, 322.)

[9] TWEAN's closing argument at trial conceded this evidentiary question, pointing out to the Court that "the $18 rate, we found out in the testimony, is not even a firm rate." (Trial Tr. 638.)

by TWEAN's admission at trial, remains in effect. (Trial Tr. 119.) The "issues in dispute" at the end of trial solely concerned terms of the Proposed Agreement (V. Compl. ¶¶ 44–49), a draft agreement to which neither party ever became a signatory.

III.

MUNICIPAL POLE ATTACHMENT REGULATION UNDER N.C. GEN. STAT. § 62-350

{31}    The Statute, enacted in July 2009, assigns exclusive jurisdiction over "disputes" between municipal pole owners and attaching communication service providers to this Court. *See* N.C. GEN. STAT. § 62-350(c) (2012). This matter is the first of its kind to advance to trial under the Statute. As background to the Court's analysis of the issues presented by the parties, the pertinent provisions of the Statute are set forth below.

A.

POLE ACCESS AND NEGOTIATION REQUIREMENTS

{32}    The Statute provides that

[a] municipality, or a membership corporation organized under Chapter 117 of the [North Carolina] General Statutes, that owns or controls poles, ducts, or conduits shall allow any communications service provider to utilize its poles, ducts, and conduits at just, reasonable, and nondiscriminatory rates, terms, and conditions adopted pursuant to negotiated or adjudicated agreements.

§ 62-350(a). Subsection (a) of the Statute further instructs municipal and cooperative pole owners that

[a] request to utilize poles, ducts, or conduits under this section may be denied only if there is insufficient capacity or for reasons of safety, reliability, and generally applicable engineering principles, and those limitations cannot be remedied by rearranging, expanding, or otherwise reengineering the facilities at the reasonable and actual cost of the municipality or membership corporation to be reimbursed by the communications service provider. In granting a request under this section, a municipality or membership corporation shall require the requesting entity to comply with applicable safety requirements, including the [NESC] and the applicable rules and regulations issued by [OSHA].

*Id.*

{33}    Subsection (b) of the Statute requires that

Following receipt of a request from a communications service provider,[10] a municipality or membership corporation shall negotiate concerning the rates, terms, and conditions for the use of or attachment to the poles, ducts, or conduits that it owns or controls. Following a request from a party to an existing agreement made pursuant to the terms of the agreement or made within 120 days prior to or following the end of the term of the agreement, the communications service provider and the municipality or membership corporation which is a party to that agreement shall negotiate concerning the rates, terms, and conditions for the continued use of or attachment to the poles, ducts, or conduits owned or controlled by one of the parties to the agreement. The negotiations shall include matters customary to such negotiations, including a fair and reasonable rate for use of facilities, indemnification by the attaching entity for losses caused in connection with the attachments, and the removal, replacement, or repair of installed facilities for safety reasons. Upon request, a party shall state in writing its objections to any proposed rate, terms, and conditions of the other party.

§ 62-350(b).

B.

BUSINESS COURT JURISDICTION UNDER THE STATUTE

{34}    Subsection 62-350(c) of the Statute provides that either party to an attachment "dispute" may bring an action in the Business Court, as the court of exclusive jurisdiction, "[i]n the event the parties are unable to reach an agreement within 90 days of a request to negotiate pursuant to subsection (b) . . . , or if either party believes in good faith that an impasse has been reached prior to the expiration of the 90-day period." § 62-350(c). Subsection (c) further requires the parties to "identify with specificity in their respective pleadings the issues in dispute," and provides that

---

[10] The Statute defines "communications service provider" as "a person or entity that provides or intends to provide: (i) telephone service as a public utility under Chapter 62 of the General Statutes or as a telephone membership corporation organized under Chapter 117 of the General Statutes; (ii) broadband service, but excluding broadband service over energized conductors owned by a municipality or membership corporation; or (iii) cable service over a cable system as those terms are defined in Article 42 of Chapter 66 of the General Statutes." § 62-350(e).

the Business Court shall (i) establish a procedural schedule which, unless otherwise agreed by the parties, is intended to resolve the action within a time period not to exceed 180 days of the commencement of the action, (ii) resolve any dispute identified in the pleadings consistent with the public interest and necessity so as to derive just and reasonable rates, terms, and conditions, taking into consideration and applying such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under section 224 of the Communications Act of 1934, as amended,[11] and (iii) apply any new rate adopted as a result of the action retroactively to the date immediately following the expiration of the 90-day negotiating period or initiation of the lawsuit, whichever is earlier.

§ 62-350(c).

{35}    Prior to commencement of an action, the attaching entity must pay any undisputed fees owed to a municipal or cooperative pole owner under an existing agreement, and the Court "may resolve any existing disputes regarding fees alleged to be owing under a preexisting agreement or regarding safety compliance arising under subsection [62-350](d)." *Id.*[12]  The Statute does not apply to entities "whose poles, ducts, and conduits are subject to regulation under section 224 of the Communications Act of 1934, as amended." *Id.*

IV.

LEGAL STANDARD

{36}    Jurisdiction of a court is "'[t]he legal power and authority of a court to make a decision that binds the parties to any matter properly brought before it.'" *In re T.R.P.*, 360 N.C. 588, 590, 636 S.E.2d 787, 789–90 (2006) (quoting BLACK'S LAW DICTIONARY 856 (7th ed. 1999)).  In addition to personal jurisdiction, i.e., the jurisdiction a court must have over the parties "to 'bring [them] into its adjudicative process,'" *id.* at 590, 636 S.E.2d at 790 (quoting BLACK'S LAW DICTIONARY 857), "the

---

[11] Encoded as 47 U.S.C. § 224.

[12] Subsection (d) of the Statute outlines default safety provisions that apply in the absence of an agreement between an attaching communications service provider and the hosting municipality or membership corporation.  § 62-350(d).

court must . . . have subject matter jurisdiction, or '[j]urisdiction over the nature of the case and the type of relief sought,' in order to decide a case." *Id.*

{37} "'A universal principle as old as the law is that the proceedings of a court without jurisdiction of the subject matter are a nullity.'" *Id.* (quoting *Burgess v. Gibbs*, 262 N.C. 462, 465, 137 S.E.2d 806, 808 (1964)). Therefore, "'[i]f a court finds at any stage of the proceedings that it lacks jurisdiction over the subject matter of a case, it must dismiss the case for want of jurisdiction.'" *Sarda v. City/County of Durham Bd. of Adjustment*, 156 N.C. App. 213, 215, 575 S.E.2d 829, 831 (2003) (quoting *State v. Linemann*, 135 N.C. App. 734, 739, 522 S.E.2d 781, 785 (1999) (citing *Burgess v. Gibbs*, 262 N.C. 462, 465, 137 S.E.2d 806, 808 (1964))).

{38} Consequently, "[a] party may not waive [subject matter] jurisdiction," *Reece v. Forga*, 138 N.C. App. 703, 704, 531 S.E.2d 881, 882 (citing *Miller v. Roberts*, 212 N.C. 126, 193 S.E. 286 (1937)), *disc. rev. denied*, 352 N.C. 676, 545 S.E.2d 428 (2000), "and a court has inherent power to inquire into, and determine, whether it has jurisdiction and to dismiss an action *ex mero motu* when subject matter jurisdiction is lacking." *Id.* at 704–05, 531 S.E.2d at 882 (citing *Lemmerman v. A.T. Williams Oil Co.*, 318 N.C. 577, 350 S.E.2d 83, *reh'g denied*, 318 N.C. 704, 351 S.E.2d 736 (1986)).

V.

ANALYSIS

{39} Because the facts of the case before the Court do not admit of any actual wrong or loss suffered by Plaintiff related to the "issues in dispute" remaining at the time of trial, the Court has, *sua sponte*, raised the issue of justiciability for post-trial briefing and argument by the parties and amici. *See Reece*, 138 N.C. App. at 704–05, 531 S.E.2d at 882 ("[A] court has inherent power to inquire into, and determine, whether it has jurisdiction and to dismiss an action *ex mero motu* when subject matter jurisdiction is lacking." (citing *Lemmerman*, 318 N.C. 577, 350 S.E.2d 83)).

{40} As set out below, the Court concludes that the particular facts before it do not create a controversy sufficient for adjudication—under either the traditional

common law standard or under the standard developed through Declaratory Judgment Act case law— to confer subject matter jurisdiction upon the Court.

A.

THE CONTROVERSY REQUIREMENT

{41}    Subject matter jurisdiction of North Carolina courts "'depends on the existence of a justiciable . . . controversy.'" *Prop. Rights Advocacy Grp. v. Town of Long Beach*, 173 N.C. App. 180, 182, 617 S.E.2d 715, 717 (2005), *aff'd* 360 N.C. 474, 628 S.E.2d 768 (2006) (quoting *Creek Pointe Homeowner's Ass'n v. Happ*, 146 N.C. App. 159, 164, 552 S.E.2d 220, 225 (2001), *disc. rev. denied*, 356 N.C. 161, 568 S.E.2d 191 (2002)).  The predicate facts necessary to constitute a controversy are distinguishable from those required to support a party's standing to litigate, i.e., whether one is qualified under the law to sue or be sued over a particular matter that is itself justiciable.  *See id.* ("Standing is *another* prerequisite to jurisdiction." (emphasis added)); *see also Goldston v. State*, 361 N.C. 26, 30, 637 S.E.2d 876, 879 (2006) ("'[T]he "gist of the question of standing" is whether the party seeking relief has alleged . . . a [sufficient] personal stake in the outcome *of the controversy . . . .*'" (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968) (emphasis added))).

{42}    The necessity of a controversy also stands apart from any distinctions our appellate courts have drawn between federal "case or controversy" and "controversy" as defined under North Carolina law.  *See, e.g., Neuse River Foundation, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002), *disc. rev. denied*, 356 N.C. 675, 577 S.E.2d 628 (2003) ("North Carolina courts are not constrained by the 'case or controversy' requirement of Article III of the United States Constitution."); *but see also id.* at 114, 574 S.E.2d at 51–52 ("[T]he term [standing] refers to whether a party has a sufficient stake in an *otherwise justiciable controversy* so as to properly seek adjudication of the matter." (citing *Sierra Club v. Morton*, 405 U.S. 727, 731–32 (1972) (emphasis added))).

{43}    The *Goldston* court rejected the lower court's reliance on federal *standing* doctrine.  *See* 361 N.C. at 35, 637 S.E.2d at 882 ("[T]he nuts and bolts of

North Carolina standing doctrine are not coincident with federal standing doctrine." (citations omitted)).[13]  Yet, nowhere does the *Goldston* court question the necessity of a *controversy* for proper adjudication by a North Carolina court.  *See Goldston*, 361 N.C. at 33, 637 S.E.2d at 881 (holding that the declaratory judgment action brought by plaintiffs "*must* involve an '*actual controversy* between the parties'" (quoting *Town of Emerald Isle v. State*, 320 N.C. 640, 646, 360 S.E.2d 756, 760 (1987) (emphasis added))).

{44}    The North Carolina Court of Appeals has characterized "[t]he relationship between standing and the requirement of a justiciable controversy" by stating that "'[s]tanding is that aspect of justiciability focusing on the party seeking a forum rather than on the issue he wants adjudicated.'"  *Creek Pointe Homeowner's Ass'n*, 146 N.C. App. at 165, 552 S.E.2d at 225 (quoting *Bremner v. City & County of Honolulu*, 96 Haw. 134, 139, 28 P.3d 350, 355 (2001)).[14]  Simply put, standing pertains to "the party seeking a forum[;]" justiciable controversy pertains to "the issue [a party] wants adjudicated."

{45}    *Bremner*, a case from the Intermediate Court of Appeals of Hawai'i that our Court of Appeals quotes in distinguishing standing from controversy, involved review of the trial court's dismissal—for lack of standing and lack of ripeness—of constitutional and due process claims against local government entities prompted by the proposed enactment of a zoning plan of development that had not yet been implemented.  96 Haw. at 138, 28 P.3d at 354.  In discussing standing, the

---

[13]  *Goldston* distinguished North Carolina's "injuriously affected" requirement for standing under *Piedmont Canteen Serv., Inc. v. Johnson*, 256 N.C. 155, 166, 123 S.E.2d 582, 589 (1962) from the "injury in fact" standard announced as one of three elements of federal standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), employed by the court below, *see Goldston v. State*, 173 N.C. App. 416, 618 S.E.2d 785 (2005), *rev'd and remanded*, 361 N.C. 26, 637 S.E.2d 876, and originally adopted by the North Carolina Court of Appeals in *Neuse River Foundation*, 155 N.C. App. at 114, 574 S.E.2d at 52.  *See* 361 N.C. at 35, 637 S.E.2d at 882.

[14] The Court here notes that the facts of *Creek Pointe Homeowner's Ass'n* did not call upon the Court of Appeals to address the question whether a justiciable controversy was present. *See Creek Pointe Homeowner's Ass'n*, 146 N.C. App. at 161–62, 552 S.E.2d at 222–23 (reviewing whether the trial court erred in dismissing, for lack of standing, the association's claims seeking to enjoin defendant from maintaining a fence around his contiguous lots, allegedly in violation of an easement in favor of association members).

*Bremner* court rejected the applicability of the federal "case or controversy" requirement under Hawai'i law, and took the further step of classifying Hawai'i's controversy requirement as "prudential," rather than constitutionally-imposed:

> Though the courts of Hawaii [sic] are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, § 2 of the United States Constitution, we nevertheless believe judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context. For "prudential rules" of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society are always of relevant concern. And even in the absence of constitutional restrictions, courts still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government. In short, judicial intervention in a dispute is normally contingent upon the presence of a "justiciable" controversy.

*Id.* at 139, 28 P.3d at 355. While our own Court of Appeals has similarly rejected the applicability of the federal constitutional basis for a "case or controversy" requirement under North Carolina law, *see Neuse River Foundation*, 155 N.C. App. at 114, 574 S.E.2d at 52 ("North Carolina courts are not constrained by the 'case or controversy' requirement of Article III of the United States Constitution."), our appellate division has not joined Hawai'i in relegating "controversy" to the status of a "prudential rule" of adjudication.[15,16]

---

[15] The *Neuse River Foundation* court's rejection of the federal "case or controversy" requirement was, like the *Bremner* panel's, couched in a discussion of standing to sue, under facts which would obviate any reasonable question whether an actual controversy was present. *See Neuse River Foundation* 155 N.C. App. at 112–13, 574 S.E.2d at 50–51 (reviewing the trial court's dismissal, for lack of standing, of claims by various plaintiffs, including environmental interest groups, seeking "non-individualized, or public, forms of relief" based on allegations that "defendants improperly handled hog waste, resulting in massive pollution and contamination of the Neuse, New, and Cape Fear Rivers, and those rivers' tributaries and estuaries."). The Court, therefore, does not interpret *Neuse River Foundation*'s rejection of the federal "case or controversy" requirement as a challenge to the judicial *controversy* requirement that is well-settled in North Carolina.

[16] Some scholars, in challenging the constitutional origins of the *standing* doctrine have likewise questioned the United States Supreme Court's reliance on English common law as the basis for American law principles of standing, and, to a lesser extent, the controversy

{46}     North Carolina Courts have, in fact, defined "the presence of a genuine controversy" as a "jurisdictional necessity." *Town of Tryon v. Duke Power Co.*, 222 N.C. 200, 204, 22 S.E.2d 450, 453 (1942); *see id.* ("'It is no part of the function of the courts, in the exercise of the judicial power vested in them by the Constitution, to give advisory opinions, or to answer moot questions, or to maintain a legal bureau for those who may chance to be interested, for the time being, in the pursuit of some academic matter.'" (quoting *Poore v. Poore,* 201 N.C. 791, 792, 161 S.E. 532, 533 (1931))); *see also id.* ("[T]he principle which protects the jurisdiction of the Court from the[se] invasions and keeps its decisions within the traditional judicial functions is the presence of a genuine controversy . . . .").[17]  Recognizing that "[s]ubject matter jurisdiction is conferred upon the courts by *either* the North Carolina Constitution *or by statute*," *Harris v. Pembaur*, 84 N.C. App. 666, 667, 353 S.E.2d 673, 675 (1987) (citing N.C. CONST. art. I, § 18 (emphasis added)), this Court is unaware of any act of the General Assembly that serves to enlarge the subject matter jurisdiction of the trial division outside the bounds of controversy as defined by the courts, or beyond the role traditionally ascribed to the judiciary as a settler of

requirement.  *See* Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 Yale L.J. 816 (1969); Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255 (1961).  To the extent that North Carolina courts have also risked conflating the issue of standing with the judicial controversy requirement, the Court observes that our courts' discussions of justiciability generally presume satisfaction of the controversy requirement.  *See, e.g., Neuse River Foundation*, 155 N.C. App. 110, 574 S.E. 48 (deciding whether plaintiffs had standing to sue defendants for prior pollution of waterways); *Goldston v. State*, 361 N.C. 26, 637 S.E.2d 876 (2006) (holding that plaintiffs had general taxpayer standing against the Governor and General Assembly based on prior misappropriation of dedicated Highway Trust Fund monies).

[17] Obscuring the judicial "controversy" requirement is the historical practice, by the North Carolina Supreme Court, of periodically issuing advisory opinions in exceptional circumstances without any corresponding express constitutional authority for such action. *See* Margaret M. Bledsoe, *The Advisory Opinion in North Carolina: 1947 to 1991*, 70 N.C. L. Rev. 1853; Preston W. Edsall, *The Advisory Opinion in North Carolina*, 27 N.C. L. Rev. 297 (1949).  As Bledsoe notes, however, the North Carolina Supreme Court has generally observed narrow limitations on the issuance of such opinions, including a refusal to provide them to private litigants.  Bledsoe at 1884 (citing *Spencer v. Spencer*, 37 N.C. App. 481, 489, 246 S.E.2d 805, 810, *disc. rev. denied*, 296 N.C. 106, 249 S.E.2d 804 (1978), *cert. denied*, 441 U.S. 958 (1979)); *see also Spencer*, 37 N.C. App. at 489, 246 S.E.2d at 810 ("Our courts, both state and federal, have long held that they were prohibited from issuing advisory opinions to private litigants . . . .").

genuine disputes under our system of governance. *See, e.g., Poore*, 201 N.C. at 792, 161 S.E. at 533 (stating, with respect to its refusal to adjudicate a matter lacking a controversy, that "[t]he parties have misconceived the scope of the Declaratory Judgment Act . . . . It does not extend to the submission of a theoretical problem or a 'mere abstraction.' If it did, its validity might well be doubted." (citations omitted)).[18]

B.

THE CONTOURS OF "CONTROVERSY" IN NORTH CAROLINA

1.

CONTROVERSY UNDER THE DECLARATORY JUDGMENT ACT

{47}    As exemplified by *Poore, Town of Tryon*, and *Lide v. Mears*, 231 N.C. 111, 56 S.E.2d 404 (1949), North Carolina law defining the lower contours of "controversy" has largely been developed by our courts in the context of the North Carolina Declaratory Judgment Act (the "Act"), *see* N.C. GEN. STAT. §§ 1-253 to -257, in cases where the particular facts at issue required the Court to determine whether a controversy sufficient for adjudication was present. *See Poore,* 201 N.C. at 793, 161 S.E. at 533; *Town of Tryon*, 222 N.C. at 202, 22 S.E.2d at 450; *and Lide*, 231 N.C. at 123, 56 S.E.2d at 412.

{48}    The Act, by its terms, directs that "[c]ourts of record within their respective jurisdictions shall have power to declare rights, status, and other legal

---

[18] Article I, § 18 of the North Carolina Constitution also apparently presumes that a proper plaintiff must allege some actual injury—i.e., a controversy—to be guaranteed access to our courts. *See* N.C. CONST. art. I, § 18 (2012) ("Courts shall be open; every person *for an injury done him* in his lands, goods, person, or reputation shall have remedy by due course of law . . . .") (emphasis added); *see also Harris*, 84 N.C. App. at 668, 353 S.E.2d at 675 ("'[O]riginal general jurisdiction of all *justiciable matters* of a civil nature *cognizable* in the General Court of Justice is vested in the aggregate in the superior court division and the district court division as the trial divisions of the General Court of Justice.'" (quoting N.C. GEN. STAT. § 7A-240) (emphasis added)); *and* N.C. GEN. STAT. § 1-75.3(a) ("Nothing in this Article shall be construed to confer, enlarge or diminish the subject matter jurisdiction of any court."); *see also State ex rel. Thornburg v. Lot & Bldgs.*, 107 N.C. App. 559, 563, 421 S.E.2d 374, 376, *cert. denied*, 333 N.C. 170, 424 S.E.2d 915 (1992) ("[u]nless jurisdiction is specifically placed elsewhere, both trial courts have subject matter jurisdiction over all *justiciable* civil claims." (citing generally to *Harris*) (emphasis added)).

relations, *whether or not further relief is or could be claimed.*" § 1-253 (emphasis added). In early decisions, the Court acknowledged the danger this statutory language presented by appearing to permit something more than adjudication of genuine controversies. *See Lide*, 231 N.C. at 117, 56 S.E.2d at 409 (noting that "there is much misunderstanding as to the object and scope of this legislation," but cautioning that the "Act does not license litigants to fish in judicial ponds for legal advice.")

{49} While "conceding that . . . jurisdiction has been somewhat broadened [under the Act] to serve the commendable purpose of the law in preserving rights before they are actually invaded and avoiding liabilities before they are incurred," *Tryon*, 222 N.C. at 204, 22 S.E.2d at 452 (citations omitted), the Court resisted any suggestion that the Act, by its "apparent broad terms," could "confer upon the court an unlimited jurisdiction of a merely advisory nature . . . ." *Id.* at 203, 22 S.E.2d at 452. The Court held, instead, that "[b]efore a declaratory judgment may be obtained, the existence of those conditions upon which the jurisdiction of the court may be invoked must appear," instructing that, "[u]nder the [Act,] the court will not entertain . . . a proceeding which, while adversary in form, . . . lacks the essentials of genuine controversy." *Id.*

{50} Consistent with the "apparent broad terms" of the Act itself, the Court held that actual injury preceding litigation would not be an essential requirement to obtain declaratory relief. *Id.* at 204, 22 S.E.2d at 452 ("'It is not required for purposes of jurisdiction [under the Act] that the plaintiff shall allege or show that his rights have been invaded, or violated by the defendants, or that the defendants have incurred liability to him, prior to the commencement of the action.'" (quoting *Carolina Power & Light Co. v. Iseley*, 203 N.C. 811, 820, 167 S.E. 56, 61 (1933)). The Court required only "that the plaintiff shall allege in his complaint and show at the trial, that a real controversy, arising out of the[ parties'] opposing contentions as to their respective legal rights and liabilities under a deed, will or contract in writing, or under a statute, municipal ordinance, contract or franchise, exists between or among the parties, and that the relief prayed for will make certain that

which is uncertain and secure that which is insecure." *Carolina Power & Light Co.*, 203 N.C. at 820, 167 S.E. at 61 (citing *Walker v. Phelps*, 202 N.C. 344, 162 S.E. 727 (1932)).[19]

{51}     Having first defined the Act's lower bounds of justiciable controversy in the 1930s and 1940s, the North Carolina Supreme Court has since further delineated the minimum controversy requirement for declaratory judgment actions. In *Gaston Bd. of Realtors v. Harrison*, 311 N.C. 230, 316 S.E.2d 59 (1984), the Court held that, in order "to satisfy the jurisdictional requirement of an actual controversy, it is necessary that *litigation appear unavoidable*," *id.* at 234, 316 S.E.2d at 61 (citing *North Carolina Consumers Power, Inc. v. Duke Power Co.*, 285

---

[19] That these baseline requirements for adjudication were viewed as critical to maintaining judicial integrity at the time North Carolina adopted the Uniform Declaratory Judgment Act is apparent from the tone of contemporaneous academic review. *See* M.T. Van Hecke, *The North Carolina Declaratory Judgment Act*, 10 N.C. L. Rev. 1 (1931); Edwin M. Borchard, *The Constitutionality of Declaratory Judgments*, 31 Colum. L. Rev. 561 (1931); *see also Poore*, 201 N.C. at 792, 161 S.E. at 533 (citing to the "valuable article by Dean M. T. Van Hecke in [the] North Carolina Law Review, December, 1931"). Van Hecke's article appeared in the same year that North Carolina adopted the Uniform Act, and directly addressed constitutional concerns stemming from the overt absence of language in the North Carolina Act limiting adjudication to actual *controversies*. Van Hecke, 10 N.C. L. Rev. at 3–5. Van Hecke notes that fifteen state supreme courts had already held those states' iterations of the Uniform Act constitutional, "as against the charge that they impose non-judicial functions upon the judiciary by requiring decisions on moot questions and the rendering of advisory opinions," and that "twelve others have so assumed, indicating that the charge proceeds from a misconception of the declaratory judgment's nature." *Id.* at 4. At the time, the United States Supreme Court had "blocked the final enactment of a statute by Congress authorizing the federal courts to render declaratory judgments." Borchard, 31 Colum. L. Rev. at 562. Both Borchard and Van Hecke cite to *Liberty Warehouse Co. v. Grannis*, 273 U.S. 70, 74 (1927) (holding, based on the "case or controversy" requirement of Article III, that the federal district court could not adjudicate a case brought, under its diversity jurisdiction, pursuant to the Kentucky Declaratory Judgment Act), as emblematic of the Court's concerns. Borchard, 31 Colum. L. Rev. at 562; Van Hecke, 10 N.C. L. Rev. at 5. While the Supreme Court ultimately embraced the passage of a federal declaratory judgment statute, it insisted that the new law "'does not attempt to change the essential requisites for the exercise of judicial power' which still [is] to be tested by such established principles as that 'the judicial power does not extend to the determination of abstract questions' and that '*claims based merely upon "assumed potential invasions" of rights are not enough to warrant judicial intervention.*'" *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242 (1952) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 325 (1936) (discussing the Declaratory Judgment Act of 1934, now 28 U.S.C. § 2201 (emphasis added))).

N.C. 434, 206 S.E.2d 178 (1974) (emphasis added)), and that "[m]ere apprehension or the mere threat of an action or a suit is not enough." *Id.* (citing *Newman Machine Co. v. Newman*, 2 N.C. App. 491, 163 S.E.2d 279 (1968), *rev'd on other grounds*, 275 N.C. 189, 166 S.E.2d 63 (1969)). In *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 347 S.E.2d 25 (1986), the Court added the following contours to the minimum controversy requirement under the Act:

> "[T]he imminence and practical certainty of the act or event in issue, or the intent, capacity, and power to perform, create justiciability as clearly as the completed act or event, and is generally easily distinguishable from remote, contingent, and uncertain events that may never happen and upon which it would be improper to pass as operative facts."

*Id.* at 590, 347 S.E.2d at 32 (quoting *North Carolina Consumers Power*, 285 N.C. at 451, 206 S.E.2d at 189 (quoting Edwin M. Borchard, *Declaratory Judgments* (2d ed 1941))).

{52}    As the Court has also noted, however, subsequent case law has "not as yet defined what is meant by 'unavoidable'" litigation. *City of New Bern v. New Bern-Craven Cnty. Bd. of Educ.*, 328 N.C. 557, 560, 402 S.E.2d 623, 625 (1991). The *City of New Bern* court opined that this phrase "cannot mean that there is no way in which litigation can be avoided," for the reason that "[o]ne party can always avoid litigation by not bringing an action or by not resisting his opponent's claim." *Id.* The Court posited that *Gaston Bd. of Realtors*, *North Carolina Consumers Power*, and *Sharpe*—three cases that the Court had previously ruled lacked a sufficient controversy for adjudication under the Act—all exhibited some "impediment to be removed before court action could be started." *Id.* at 561, 402 S.E.2d at 626; *see also id.* at 560–61, 402 S.E.2d at 625–26 (evaluating facts of (i)*Gaston Bd. of Realtors*, where "[t]he evidence showed there was a good chance the member would not sue the Board but would abide by the decision and seek reinstatement"; (ii) *North Carolina Consumers Power*, in which "the complaint revealed that there was not a practical certainty that the plaintiffs had the capacity to perform the contract" and "[the] Court held that the superior court was correct in dismissing the action

because there was not a justiciable controversy"; and (iii) *Sharpe*, in which "[t]he evidence showed the plaintiffs had no immediate intention of entering business in competition with the defendant" in violation of the subject non-competition agreement).

{53} Against the backdrop of these examples where controversy was lacking, the Court in *City of New Bern* held that the facts of that case were marked by "no such impediment" to litigation. *Id.* at 561, 402 S.E.2d at 626. The City of New Bern brought the action seeking a declaration that recently-passed Session Laws,[20] which conferred upon Craven County "exclusive jurisdiction for the administration and enforcement of all laws and regulations relating to building codes, and fire and safety codes as they are legally applicable to the New Bern-Craven County Board of Education, the Craven Community College, and the Craven Regional Medical Center," unconstitutionally infringed on the City's rights to administer and enforce such laws and regulations. *Id.* at 557, 402 S.E.2d at 623 (syllabus). The Court's brief analysis of the posture of the case was that "[t]he County contends it has the right to enforce certain laws. The City says the County does not have the right. This is a justiciable controversy which may be determined by a declaratory judgment action." *Id.* at 561, 402 S.E.2d at 626.

{54} The availability to the defendant of unilateral injurious action *of the type sought to be prevented by the plaintiff's suit* in *City of New Bern*, combined with the intent to so act, appear as the critical—indeed, seemingly determinative—factual distinction between *City of New Bern* and the *Gaston Bd. of Realtors*, *North Carolina Consumers Power*, and *Sharpe* cases discussed above. In *City of New Bern*, defendant Craven County claimed the power to act in the manner that plaintiff New Bern opposed under existing law, *see* 328 N.C. at 557, 402 S.E.2d at 623 (syllabus); *see also id.* at 559, 402 S.E.2d at 625 (reciting defendant's argument that "it is the prerogative of the State to confer the right to enforce building codes

---

[20] I.e., Chapter 805 of the 1986 Session Laws, Chapter 341 of the 1987 Session Laws, and Chapter 934 of the 1988 Session Laws. *City of New Bern*, 328 N.C. at 557, 402 S.E.2d at 623 (syllabus).

and fire and safety codes").  The *City of New Bern* court noted, however, that trial

courts in *Gaston Bd. of Realtors*, *North Carolina Consumers Power*, and *Sharpe* had

found as fact that neither intent nor capacity to so act was present in any of the

cases.  *Id.* at 560–61, 402 S.E.2d at 625–26 (discussing the facts of these three

cases).[21]

2.

THE LEGISLATIVE ROLE IN DEFINING SUBJECT MATTER JURISDICTION OF
NORTH CAROLINA COURTS UNDER THE DECLARATORY JUDGMENT ACT

{55}    The North Carolina Supreme Court's treatment of the controversy

requirement for adjudication under the Declaratory Judgment Act comports with

the more general notion that the North Carolina General Assembly may, "'within

constitutional limitations, . . . fix and circumscribe the jurisdiction of the courts of

this State,'" *In re T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790 (quoting *Bullington v.
Angel*, 220 N.C. 18, 20, 16 S.E.2d 411, 412 (1941)), such that "'[w]here jurisdiction is

statutory and the Legislature requires the Court to exercise its jurisdiction in a

certain manner, to follow a certain procedure, or otherwise subjects the Court to

certain limitations, an act of the Court *beyond* these limits is in excess of its

jurisdiction.'" *Id.* (quoting *Eudy v. Eudy*, 288 N.C. 71, 75, 215 S.E.2d 782, 785

(1975), *overruled on other grounds by Quick v. Quick*, 305 N.C. 446, 290 S.E.2d 653

(1982) (emphasis added)).  Although our Legislature may statutorily *limit* court

jurisdiction under the above-stated principle, *see id.*, and may statutorily extend

---

[21] In this sense, the "no impediments to litigation" standard adopted by our Supreme Court
bears some relation to the "ripeness" doctrine, which our courts have invoked in cases
involving potential harms (i.e., in non-Declaratory Judgment Act settings) that have not
materialized at the time of adjudication.  *See Orange Cnty. v. Dept. of Transportation*, 46
N.C. App. 350, 387, 265 S.E.2d 890, 914 (ruling, in a suit for judicial review of
administrative process and for temporary and permanent injunctions, that if federal
approval for the location of a highway was not obtained, plaintiffs' challenge to location
"must be dismissed for want of ripeness"), *disc. rev. denied*, 301 N.C. 94 (1980); *see also
Granville Cnty. Bd. of Comm'rs v. N.C. Hazardous Waste Mgmt. Comm'n*, 329 N.C. 615,
625, 407 S.E.2d 785, 791 (1991) (discretionary review of preliminary injunction) ("Unless
and until the Commission makes a final site selection decision, there is no justiciable issue
and no genuine controversy between the parties.  'When no genuine controversy presently
exists between the parties,' the courts cannot and should not intervene." (quoting *Angell v.
City of Raleigh*, 267 N.C. 387, 391, 148 S.E.2d 233, 236 (1966))).

*standing* to parties who have suffered no actual injury prior to litigation, *see Town of Tryon*, 222 N.C. at 204, 22 S.E.2d at 452 (acknowledging that the Act may vest standing prior to actual injury), our courts have zealously protected the judicially established *controversy* requirement as a separate and distinct baseline for justiciability. *See Lide*, 231 N.C. at 118, 56 S.E.2d at 409 (noting that, while the Act "enables courts to take cognizance of disputes at an earlier stage than that ordinarily permitted by the legal procedure which existed before its enactment, it preserves inviolate the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants"); *and Town of Tryon*, 222 N.C. at 204, 22 S.E.2d at 453 ("[T]he principle which protects the jurisdiction of the Court from . . . invasions and keeps its decisions within the traditional judicial functions is the presence of a genuine controversy.").

{56} Consistent with these observations, the Declaratory Judgment Act case law discussed above suggests that the "expansion" of subject matter jurisdiction under the Act—i.e., with respect to the lower bounds of *controversy*—is ultimately a product of a judicial, rather than a legislative, process. *See, e.g., Town of Tryon*, 222 N.C. at 205, 22 S.E.2d at 453 ("[I]n the absence of any express provision making the existence of an actual controversy necessary to . . . jurisdiction, this limitation is nevertheless implied and will be observed by the courts." (citations omitted)). Case law under the Act leads this Court to conclude that, despite any inference to the contrary that may be extrapolated from the language of a given statute, and despite its power to statutorily grant *standing* to a given class of plaintiffs, the General Assembly has never drafted around the judicial controversy requirement. *See, e.g., Poore*, 201 N.C. at 792, 161 S.E. at 533 (noting that if the Act were to permit the court to issue advisory opinions, "its validity might well be doubted." (citations omitted)). This principle of North Carolina law is most aptly illustrated by the less-stringent controversy standard applied by our courts as a rule of decision developed through the process of appellate judicial review in cases brought under the Act.

3.

## THE CONTROVERSY REQUIREMENT FOR DECLARATORY JUDGMENT ACTIONS VERSUS "NON-DECLARATORY JUDGMENT ACT" CASES

{57}    Throughout the history of the Act, the North Carolina Supreme Court has maintained a distinction between the controversy standard our courts should employ when adjudicating cases brought under the Act and the controversy requirement to which our courts must hold other civil actions ("non-Declaratory Judgment Act" cases).  *See Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760 ("'The essential distinction between an action for Declaratory Judgment and the usual action is that no actual wrong need have been committed or loss have occurred in order to sustain the declaratory judgment action, but there must be no uncertainty that the loss will occur or that the asserted right will be invaded.'" (quoting 22 AM. JUR. 2D *Declaratory Judgments* § 1)); *see also Newman Machine Co.*, 2 N.C. App. at 495, 163 S.E.2d at 282 ("'It would appear that declaratory relief was unknown at common law, inasmuch as the common-law conception of courts was that they were a branch of the government created to redress private wrongs and punish the commission of crimes and misdemeanors.  The courts took no official interest in the affairs of civil life until one person had wronged another; then the object was to give relief for the injury inflicted.'" (quoting 22 AM. JUR. 2D *Declaratory Judgments* § 3)).

{58}    Our Court of Appeals has, nevertheless, applied the "litigation appearing unavoidable" standard in three "non-Declaratory Judgment Act" cases within the last decade.  *See Bailey & Assocs., Inc. v. Wilmington Bd. of Adjustment*, 202 N.C. App. 177, 689 S.E.2d 576 (2010) (affirming the Superior Court's denial of petitioner's motion to dismiss intervenors' appeal brought under a repealed municipal ordinance, where a "savings provision" in the new ordinance permitted petitioner's pending development plan to proceed under the prior ordinance, thus preserving intervenors' claim); *State ex. rel Utils. Comm'n v. Carolina Water Serv., Inc.*, 149 N.C. App. 656, 562 S.E.2d 60, *disc. rev. granted*, 355 N.C. 757, 566 S.E.2d 481 (petitioners), 356 N.C. 176, 567 S.E.2d 145 (respondent), *rev. improvidently*

*allowed*, 356 N.C. 429, 571 S.E.2d 585 (2002) (vacating and remanding appeal from Utilities Commission decision, requested by Public Staff, and holding that provisions of respondent's water service contracts were against public policy, where no "party potentially adverse to the rights of Carolina Water has complained of the provisions"); *and Norman v. R.J. Reynolds Tobacco Co.*, No. COA03-672, 2004 N.C. App. LEXIS 712, at \*17 (N.C. Ct. App. March 1, 2004) (unpublished opinion) (affirming Industrial Commission's denial of plaintiff's motion to amend the Commission's Opinion and Award where plaintiff argued that portions of the order addressing salary and benefit payments made by defendant to plaintiff before the hearing were "not clear, but would appear to allow defendants to claim a credit to which they are not entitled" (internal quotation omitted)).

{59}    The use of "litigation appearing unavoidable" as a controversy standard in each of these cases raises the question whether the standard once applicable only to declaratory judgment actions now applies to "non-Declaratory Judgment Act" claims.

{60}    Of the three cases cited, two quote the rule that "'litigation [must] appear unavoidable'" in order to "'satisfy the jurisdictional requirement of an actual controversy,'" without themselves citing to the Act or further explaining the reasoning underlying the court's appropriation of this language to define the controversy standard in non-Declaratory Judgment Act cases. *See Bailey & Assocs.*, 202 N.C. App. at 182, 689 S.E.2d at 581 (quoting *Prop. Rights Advocacy Group*, 173 N.C. App. at 182, 617 S.E.2d at 717 (quoting *Carolina Water Serv.*, 149 N.C. App. at 658, 562 S.E.2d at 62–63)); *see also Norman*, 2004 N.C. App. LEXIS 712 at \*17–18 (quoting *Sharpe*, 317 N.C. at 589, 347 S.E.2d at 32 (quoting *Gaston Bd. of Realtors*, 311 N.C. at 234, 316 S.E.2d at 61)).

{61}    The *Bailey* court's use of the "unavoidable" standard is perhaps the most troubling considering that the court's decision concerned the petitioner's motion to dismiss the intervenors' appeal on *mootness* grounds, rather than for the absence of an actual controversy. *See id.* at 181–82, 689 S.E.2d at 581; *see also id.* at 182–83, 689 S.E.2d at 581–82 (reasoning that the "general proposition" that

"'[r]epeal of a challenged law generally renders moot the issue of the law's interpretation or constitutionality'" did not apply because of a savings provision preserving pending claims under the repealed ordinance); *and id.* at 183, 689 S.E.2d at 582 ("Thus, . . . Intervenors' . . . appeal from the trial court's order is not moot and Petitioner's motion to dismiss Intervenors' appeal is denied."). Furthermore, in its discussion of petitioner's motion, the *Bailey* court correctly recites the apposite rule that "'[w]henever, during the course of litigation it develops that the relief sought has been granted or that the questions *originally in controversy between the parties* are no longer at issue, the case should be dismissed, for courts will not entertain or proceed with a cause merely to determine abstract propositions of law.'" *Id.* at 182, 689 S.E.2d at 581 (quoting *In re Peoples*, 296 N.C. 109, 147–48, 250 S.E.2d 890, 912 (1978), *cert. denied*, 442 U.S. 929 (1979) (emphasis added)). These factors suggest that the *Bailey* court's discussion of "unavoidability" may be regarded as nothing more than *gratis dictum.*[22]

{62}     Because *Norman* similarly fails to explain or qualify its use of the term "unavoidability" to describe the controversy standard under which it evaluated the assignment of error advanced by the plaintiff in that case, *see Norman*, 2004 N.C. App. LEXIS 712, at *17–18, the Court is left to presume that the *Norman* court intended to apply this standard in a non-Declaratory Judgment Act setting. However, as *Norman* is an unpublished and therefore non-binding opinion, *see id.* at *1; N.C. R. App. P. 30(e)(3), any suggestion that *Norman* establishes "unavoidability of litigation" as a standard for non-Declaratory Judgment Act

---

[22] The Court here notes that, while our courts have consistently characterized "controversy" as a jurisdictional issue, *see, e.g., City of New Bern*, 328 N.C. at 560, 402 S.E.2d at 625, they have treated "mootness" in the manner of a "prudential" concern. The *In re Peoples* decision distinguishes "federal . . . mootness doctrine," which the court regards as "grounded primarily in the 'case or controversy' requirement of Article III, Section 2 of the United States Constitution and . . . labeled 'jurisdictional' by the United States Supreme Court," from the function of mootness at the State level, asserting that "[i]n state courts the exclusion of moot questions from determination is not based on a lack of jurisdiction but rather represents a form of judicial restraint." 296 N.C. at 147, 250 S.E.2d at 912 (citations omitted).

claims is unpersuasive to this Court, especially in light of the *Norman* court's failure to invoke any binding rule of decision.

{63}     The *Carolina Water Service* court, unlike the *Bailey* and *Norman* panels, expressly roots its application of the "unavoidability" standard for controversy in the Declaratory Judgment Act. *See Carolina Water Service*, 149 N.C. App. at 657–58, 562 S.E.2d at 62 ("[N]either the Utilities Commission nor the appellate courts of this State have the jurisdiction to review a matter which does not involve an actual controversy. . . . The [Act] permits the courts to review certain disputes at an *earlier stage* than was normally permitted at common law. . . . Nevertheless, . . . an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." (citations omitted)).  The court prefaces its invocation of the "unavoidability" standard with the observation that "[i]n actions involving a request for a declaratory judgment, our Supreme Court 'has required that an actual controversy exist both at the time of the filing of the pleading and at the time of hearing.'" *Id.* at 658, 562 S.E.2d at 62 (quoting *Sharpe*, 317 N.C. at 585, 347 S.E.2d at 30 (internal citations omitted)).  Yet, *Carolina Water Service* makes no mention of any claims brought under the Act by either party.  *See generally* 149 N.C. App. 656, 562 S.E.2d 60; *see also id.* at 657, 562 S.E.2d at 62 (reviewing whether the Utilities Commission erred in denying respondent's petition for a ruling that the Commission's prior order was premature because the agreements in dispute had not caused injury).  The Court of Appeals derived its authority to vacate the Commission's decision from N.C. Gen. Stat. § 62-94(b), which permits the court to "reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are . . . in excess of statutory authority or jurisdiction of the Commission . . . ." *Id.* at 659, 562 S.E.2d at 63; N.C. GEN. STAT. §§ 62-94(b), (b)(2).  "Accordingly," the court concluded, "we are bound to vacate the decision of the Utilities Commission in this case for lack of jurisdiction . . . because there is no justiciable or actual controversy between the parties." *Carolina Water Serv.*, 149 N.C. App. at

659, 562 S.E.2d at 63. The Supreme Court ultimately refused to review the lower court's decision. *See State ex rel. Utils. Comm'n v. Carolina Water Service, Inc.*, 356 N.C. 429, 571 S.E.2d 585 (ruling that review was improvidently allowed).

{64} It is unclear if the Court of Appeals in *Carolina Water Service* regarded the case to be "in the nature of a declaratory judgment action" because the Public Staff had initially "petitioned the Commission to hold the exclusive service provisions in the contracts unenforceable." *Id.* at 657, 562 S.E.2d at 62. *See* N.C. GEN. STAT. § 1-256 ("The enumeration in [N.C. Gen. Stat. §§] 1-254 and 1-255 does not limit or restrict the exercise of the general powers conferred in [N.C. Gen. Stat. §] 1-253 in any proceedings where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty."). However, this possible interpretation of *Carolina Water Service* is contravened by the fact that the "general powers" to which section 1-256 refers are those granted under section 1-253 to "courts of record." *See* § 1-253 ("[c]ourts of record within their respective jurisdictions shall have power to declare rights . . ."). As a quasi-judicial administrative body, the Commission is not a "court of record" within this statutory definition. *See, e.g., State ex. rel Util. Comm'n v. Carolina Util. Customers Assoc., Inc.*, 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998) ("[T]he Commission is required to render its decisions upon questions of law and of fact *in the same manner as* a court of record." (emphasis added)).

{65} While this Court has identified no binding decision of a North Carolina court that either instructs or prompts the Court to apply the controversy standard developed under the Act to matters that are "in the nature of declaratory judgment actions," i.e., "non-Declaratory Judgment Act" cases in which declaratory relief is otherwise sought, a plain reading of the Act implies the availability of this power. *See* N.C. GEN. STAT. § 1-256 ("The enumeration in [N.C. Gen. Stat. §§] 1-254 and 1-255 does not limit or restrict the exercise of the general powers conferred in [N.C. Gen. Stat. §] 1-253 in any proceedings where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty."). The text of the Act, nevertheless, sheds no meaningful light on the *Carolina Water*

*Service* court's use of the Act's controversy standard to adjudicate a matter that came to the judiciary as an appeal of an administrative decision, under a statute granting specified powers of review. 149 N.C. App. at 657–58, 562 S.E.2d at 62; N.C. GEN. STAT. § 1-256.

4.

SUMMARY

{66}    The Court concludes that it is reasonable to interpret an act of the General Assembly in a manner that preserves the requirement of an "actual controversy" to confer subject matter jurisdiction upon this court. *See Town of Tryon*, 222 N.C. at 205, 22 S.E.2d at 453 ("this limitation is . . . implied and will be observed by the courts").

{67}    The evolution of "controversy" in decisions under the Declaratory Judgment Act further supports the court's conclusion. *See Lide*, 231 N.C. at 118, 56 S.E.2d at 409 (citing the North Carolina Supreme Court's prior case law, rather than statute, for the principle that "an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute" (citations omitted)); *Sharpe*, 317 N.C. at 589–90, 347 S.E.2d at 32 (reciting the Act's *judicially determined* controversy standards of "litigation appear[ing] unavoidable," "imminence and practical certainty," and "intent, capacity, and power to perform," as distinguished from "remote, contingent, and uncertain events that may never happen" (citations, quotations, and emphasis omitted)); *see also Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760 (acknowledging the common law controversy requirement that "actual wrong need have been committed or loss have occurred." (quoting 22 AM. JUR. 2D *Declaratory Judgments* § 1)).

{68}    In the absence of appellate guidance, this court declines to apply an unrecognized exception to the actual injury requirement for adjudication of non-Declaratory Judgment Act cases. It nevertheless appears to the Court from a reading of the Declaratory Judgment Act itself, that the Court may apply the Act's controversy standard where the nature of relief sought would make it appropriate

for the Court to exercise the general power of declaration conferred by sections 1-253 and 1-256.

{69}     Therefore, to the extent that a statutory cause of action prays for a declaration of rights, such declaration may be issued by the Court pursuant to the terms of the Act if: (1) there exists a controversy pursuant to the Act's controversy requirement as defined by controlling authority, (2) the declaration is requested by a party, and (3) such declaration will "terminate the controversy or remove an uncertainty." § 1-256.

## C.
### ARGUMENTS OF THE PARTIES AND AMICI CURIAE

{70}     While the parties and amici all contend that this matter is justiciable, they advance somewhat different arguments in support of their respective positions. The Court summarizes each of these arguments below.

### 1.
### PLAINTIFF'S ARGUMENTS

{71}     TWEAN's initial argument for the existence of a sufficient controversy is that the Statute, by its express terms, adequately defines the requirements for adjudication of claims brought under it, as follows: (1) that the parties "shall negotiate" pursuant to section 62-350(b); (2) that "[i]f either party believes that an impasse has been reached . . . , or if 90 days have elapsed, either party may bring suit in the Business Court, *which has exclusive jurisdiction over such actions*"; and (3) that "[t]his Court is then required to resolve any dispute so as to derive just and reasonable rates, terms and conditions."  (Pl.'s Resp. to Jurisdictional Questions 2 (emphasis added) (quotations and citations omitted).)

{72}     TWEAN next notes that the parties stipulated, in a Pre-Trial Order submitted to the Court, "that Plaintiff and Defendant are properly before the Court, and that the Court has jurisdiction over the parties and subject matter of this dispute."  (Pl.'s Resp. to Jurisdictional Questions 2–3 (citing Pre-Trial Order 1).) TWEAN also appears to regard a passage from a prior Order and Opinion of the Court in this case, *Time Warner Entm't*, 2011 NCBC 19 (granting defendant's

motion for summary judgment as to plaintiff's claim of failure to negotiate and denying the motion as to plaintiff's claim of discrimination), as determinative of the issue of justiciability. In its Order and Opinion, the Court wrote: "TWEAN . . . represented that an impasse had been reached" and that, "[a]t that point, *either party had the right* to exercise its option of bringing an action in Business Court to resolve their differences." *Id.* at ¶ 56 (emphasis added).[23]

{73} TWEAN next embarks on an analysis of *standing* that the Court has previously distinguished from the judicial *controversy* requirement, *See* ¶¶ 40–44; *and Town of Tryon*, 222 N.C. at 204, 22 S.E.2d at 453 (defining "the presence of a genuine controversy" as a "jurisdictional necessity"). TWEAN attempts to fortify its argument, however, with the assertion that "the General Assembly may establish procedures that must be followed and requirements that must be met before the right to sue attaches, such as timelines to conduct negotiations, requirements to pursue mediation, or conditions that must be satisfied to establish an impasse." (Pl.'s Resp. to Jurisdictional Questions 6 (citing *Duplin Cnty. Bd. of Educ. v. Duplin Cnty. Bd. of Cnty. Comm'rs*, 201 N.C. App. 113, 117–18, 686 S.E.2d 169, 172 (2009)).) TWEAN accurately notes, in this regard, that the *Duplin Cnty. Bd.* plaintiff's "'right to file suit' was triggered under the relevant statute after the parties 'took part in a joint public meeting and several mediation sessions but failed to reach an agreement,' and 'the mediator then informed the proper parties that [the parties] were at an impasse.'" (Pl.'s Resp. to Jurisdictional Questions 6 (citing *Duplin*, 201 N.C. App. at 117–18, 686 S.E.2d at 172).)

{74} TWEAN further argues that because of (1) Landis' adoption of a default rate of $50 per attachment in its pole attachment ordinance amendment, and (2) the statement, in the Town's August 3, 2009, letter to TWEAN, that the Town would impose this much higher rate upon TWEAN should TWEAN refuse to sign a new agreement, it "faced an immediate and threatened injury sufficient to ensure that TWEAN would 'battle the issue' and the litigation would present a live

---

[23] Landis' brief echoes this argument with reference to the Court's prior Order and Opinion. (*See* Def.'s Supplemental Br. 3–4.)

dispute." (Pl.'s Resp. to Jurisdictional Questions 8 (citing *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642–43, 669 S.E.2d 279, 282–83 (2008)).) The Court discerns from this argument what TWEAN believes to be the factual controversy underlying this action, i.e., that TWEAN faced a "Hobson's choice: either agree to Landis's one-sided proposal and six-fold rate increase within 30 days, or pay a 'prohibitive' rate as a penalty under the ordinance." (Pl.'s Resp. to Jurisdictional Questions 8–9.) Invoking *Goldston*, TWEAN argues that "[t]his type of imminent harm . . . guarantees that TWEAN 'has [alleged] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.'" (Pl.'s Resp. to Jurisdictional Questions 9 (quoting *Goldston*, 361 N.C. at 30, 637 S.E.2d at 879 (internal quotations omitted)).).

{75} In its reply briefing, TWEAN: (i) reiterates the notion that a "live dispute" arises in this matter from an "immediate and threatened injury—the imposition of Landis's [proposed] pole attachment rate, which [TWEAN] believes is unjust, unreasonable and unlawful"; (ii) contends that "[t]he parties agree that a genuine case or controversy exists"; and (iii) complains that "[i]f the present dispute is *not* justiciable, [s]ection 62-350 is effectively a dead letter," (Pl.'s Reply Supp. Resp. to Jurisdictional Questions 3), and that "'[i]f [TWEAN]'s injury does not confer standing[,] then no party coming to the Business Court under [s]ection 62-350 will have standing, rendering the [S]tatute a nullity.'" (Pl.'s Reply Supp. Resp. to Jurisdictional Questions 4 (quoting NCCTA Supplemental Mem. Law 14).)

{76} TWEAN further argued, at the July 17, 2012, hearing that Landis "imposed" harm on TWEAN in the form of the $18 attachment rate contained in the Proposed Agreement and the $50 default rate in the 2009 amendment to Landis' pole attachment ordinance. At the hearing, TWEAN conceded, however, that (1) it could have sought an injunction under the Statute but chose not to do so, and (2) the $50 default rate under Landis' pole attachment ordinance was not among the "issues in dispute" it brought before the Court.

2.

DEFENDANT'S ARGUMENTS

{77}    Landis' argument begins with the assertion that "North Carolina's appellate courts have consistently followed relaxed requirements for *standing* that encompass both immediate . . . or threatened injury." (Def.'s Supplemental Br. 1 (citing *Mangum*, 362 N.C. at 642–43, 669 S.E.2d at 281–82 (emphasis added)).) The Town next argues that "the General Assembly created a private right of action for a communications service provider such as TWEAN," where either "(1) the parties are unable to reach an agreement within 90 days of negotiation; or (2) an impasse has been reached." (Def.'s Supplemental Br. 2 (citing N.C. GEN. STAT. § 62-350(c)).) Other standing arguments follow (*see* Def.'s Supplemental Br. 3–5), including invocation of *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 616, 599 S.E.2d 365, 377 (2004), for the proposition that "when matters of public interest and public importance are presented to the court, *standing* requirements may be further relaxed as if the action were a declaratory judgment action, rather than 'risk *further and continued* damage because the perfect civil action has proved elusive.'" (Def.'s Supplemental Br. 4–5 (quoting *Hoke County Bd.*, 358 N.C. at 616, 599 S.E.2d at 377 (emphasis added)).)[24]

{78}    Landis also asserts that "when an impasse in negotiations has been reached, the municipality has, as a matter of law and as a practical matter, fixed the rate . . . [t]hus, as a practical matter, the 'proposed rate' that the municipality has determined cannot be reduced any lower <u>is</u> the actual rate." (Def.'s Supplemental Br. 3.)

{79}    At the July 17, 2012, hearing, Landis argued that a controversy is present in this matter because *Landis* has been injured by not having been permitted to charge TWEAN for pole access at the $18 rate the Town now purports

---

[24] The Court here notes that *Hoke Cnty. Bd.* involved a trial court finding that the State *had* (i.e., previously) *failed* to provide adequate resources for all students in Hoke County schools to receive a "sound basic education," including incoming "at-risk" students who were not yet enrolled. 358 N.C. at 640, 599 S.E.2d at 392.

to have "adopted."[25]  Landis conceded, however, that a ruling for the Town in this matter would do nothing to prevent TWEAN from walking away from the Proposed Agreement in the exercise of TWEAN's business judgment.

3.

ARGUMENTS OF AMICI

{80}    NCCTA's opening brief focuses on standing, arguing that "the legislature may, within the bounds of the Constitution, create a cause of action by statute." (NCCTA Supplemental Mem. Law 4 (citing *Animal Legal Defense Fund v. Woodley*, 181 N.C. App. 594, 596, 640 S.E.2d 777, 779 (2007) (affirming constitutionality of animal welfare statute that granted standing to "any person" to bring a claim under the statute) *and Lewis v. Hunter*, 212 N.C. 504, 193 S.E. 814, 817 (1937) ("The Legislature can grant the right of action in such cases, but until that is done we are constrained to follow the long unbroken line of decisions of this court.")).)  This argument specifically points to the Act as an example of such a statutory right of action. (NCCTA Supplemental Mem. Law 4.)  NCCTA concludes that "[w]here a communications service provider brings an action under [s]ection 62-350 alleging that its efforts to secure pole access at a 'just and reasonable' rate have been thwarted, it is, in effect, alleging an impingement on its statutory right of access [that is sufficient] to provide standing." (NCCTA Supplemental Mem. Law 5–6.)

{81}    Although NCCTA's reply brief also fails to directly address the controversy required for justiciability, NCCTA asserts in its brief that "[t]here is simply nothing remarkable about the General Assembly asking the Court to adjudicate disputed issues of fact relating to a failed commercial negotiation, even where that adjudication results in the court approving a particular 'price' or dollar amount." (NCCTA Supplemental Reply Mem. Law 3 (citing *Charlotte-Mecklenburg Hosp. Auth. v. Talford*, No. 379A11, 2012 N.C. LEXIS 408 (N.C. June 14, 2012), and

---

[25] Landis did not previously raise this issue as required under the Statute, *see* N.C. GEN. STAT. § 62-350(c) ("The parties shall identify with specificity in their respective pleadings the issues in dispute . . . ."), and the Court did not invite the parties to submit any additional evidence at the post-trial hearing.

*Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 504, 681 S.E.2d 278, 282 (2009)).)  Though this assertion is couched in a discussion of constitutionality, the Court interprets NCCTA's argument as postulating that "a failed commercial negotiation" may constitute a sufficient controversy for adjudication, as provided by statute.[26]

{82}  NCAEC's brief comes closest to addressing the controversy issue by arguing that the scope of the private right of action created under subsection (c) of the Statute "is limited . . . to alleged conduct that, if proven, would constitute a violation of [s]ection [62-]350(a), because only rates, terms or conditions that are proven to violate the standards imposed by that provision would be unlawful." (NCAEC Supplemental Amicus Br. 4.)  To this end, NCAEC argues, adjudication of disputes under the Statute are "properly . . . limited to those rates, terms and conditions that have been *adopted by* the pole owner's governing body; disputes about proposals that were made . . . but never adopted by a pole owner fall wholly outside the scope of any jurisdiction granted to the Business Court by [s]ection [62-]350(c)."  (NCAEC Supplemental Amicus Br. 4 (emphasis added).)  NCAEC explains that for the Statute to require this Court "to arbitrate between all the various proposals exchanged during negotiations . . . would permit a single communication service provider to require the Business Court to revisit *de novo*, arbitrate, and resolve every disputed issue that might arise from the negotiations of all of the relevant pole attachment contracts."  (NCAEC Supplemental Amicus Br. 5.) NCAEC concludes that "unless the grant of additional subject matter jurisdiction made in [s]ection 350(c) is wholly void as unconstitutional, the Court would appear to have subject matter jurisdiction to adjudicate whether [TWEAN] has stated and

---

[26] *Talford* concerned the amount reasonably owed for medical services *previously rendered*. 2012 N.C. LEXIS 408, at *2–3.  Similarly, *Beaufort Cnty. Bd.* concerned an undisputed *prior* injury—the allegedly inadequate funding of Beaufort County schools.  *See Beaufort Cnty Bd.*, 363 N.C. at 501, 681 S.E.2d at 280 (reciting, in the facts of the dispute, that "[t]he School Board requested $12,106,304 and the County Commission allocated $9,434,217").

proven a claim for relief under [s]ection 350." (NCAEC Supplemental Amicus Br. 13.)[27]

{83}    NCAEC's direct argument as to the justiciability of this matter conflates standing and controversy requirements to some degree, and joins NCAEC with Landis, (*see* Def.'s Supplemental Br. 3 (asserting that "as a matter of law and as a practical matter, . . . the 'proposed rate' . . . is the actual rate")), in advancing a remarkably revisionist analysis of the evidence presented at trial:

> For purposes of determining the justiciability of the controversy, the rates, terms and conditions that are challenged by [TWEAN] have been 'adopted' by Landis, even though [TWEAN] may have refused to sign a document to agree to them, or to pay the new rates while this lawsuit has been pending. Because Landis claims entitlement to rentals at the higher rate for [TWEAN's] use while this action has been pending, [TWEAN] has been subjected to 'immediate or threatened' injury.
>
> The on-going controversy over the amount owed for use while this action is pending appears to satisfy the requirement that a plaintiff demonstrate some form of 'injury in fact' that is actual or imminent and not speculative.
>
> * * * *
>
> [T]his action is not a dispute over a 'proposed action' by Landis because [TWEAN] has alleged and ultimately must prove that the Town had committed a violation of [s]ection 350(a) by the time the complaint was filed. . . . The controversy before the court here is not a controversy about the proposed rates, terms or conditions that were exchanged during the negotiation process; [TWEAN] has alleged that Landis committed a violation of [s]ection 350(a), and thus [TWEAN] necessarily has alleged that the challenged rates, terms and conditions at issue had been adopted by Landis at the time this action was commenced.

---

[27] Although NCAEC advances this argument in its discussion of constitutionality of the Statute—which issue the Court does not reach—the Court nonetheless reads the argument as proposing a judicial limitation on actions adjudicated under the Statute, which, if properly imposed, may preserve a controversy requirement consistent with our prior case law. Yet, NCAEC's argument does not assist the Court in determining (1) whether such limitation is directly available to this Court under guiding authority, and (2) whether the controversy requirement that would result from such limitation would be consistent with the standards of justiciability discussed herein.

(NCAEC Supplemental Amicus Br. 14–15.)

### D.

### DISCUSSION

{84}     To conclude that TWEAN's "issues in dispute" present a controversy sufficient for adjudication, the Court must first determine which of the available controversy standards it should apply.  Guided by *Town of Emerald Isle*, the Court holds that there are two possible options: (1) the standard applied in the "usual action," which requires prior injury or loss, *see* 320 N.C. at 646, 360 S.E.2d at 760 (citing 22 AM. JUR. 2D *Declaratory Judgments* § 1), or (2) the standard developed under the Act, which permits "'that no actual wrong need have been committed or loss have occurred,'" but requires, nonetheless, that "'there must be no uncertainty that the loss will occur or that the asserted right will be invaded.'"  *Id.*

### 1.

### PRIOR INJURY OR LOSS

{85}     Under *Town of Emerald Isle*, unless (1) TWEAN has invoked the Act, or (2) requested relief in the nature of declaratory judgment, *see* §§ 1-253, -256, the Court may only adjudicate TWEAN's "issues in dispute" if the evidence exhibits a controversy amounting to a prior injury or loss, pursuant to the standard that applies in a "usual action."  *See Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760 (citing 22 AM. JUR. 2D *Declaratory Judgments* § 1); *Newman Machine Co.*, 2 N.C. App. at 495, 163 S.E.2d at 282 (citing 22 AM. JUR. 2D *Declaratory Judgments* § 3).

{86}     In light of TWEAN's own concessions and the uncontested evidence at trial, the "issues in dispute" before the Court fail to achieve justiciability under the standard that applies in a "usual" civil action.  The parties admit: (1) that TWEAN's pole access continues to be governed by the 1984 Agreement, under which TWEAN receives access to Landis' poles at a price below the rate it seeks to have this Court dictate as a term of the Proposed Agreement (Pl.'s Trial Ex. 8 ¶ 8; Trial Tr. 119, 655); and (2) that Landis has not imposed a fine, has not denied TWEAN pole

access, has not given notice of intent to terminate the 1984 Agreement for any reason, and has not charged TWEAN at a per-cable rate. (Trial Tr. 119, 161); *see also* discussion *supra* ¶ 29. However, even if TWEAN had proven at trial that Landis actually injured TWEAN in one of these enumerated ways, TWEAN's "issues in dispute," on their face, would still fail to present a controversy under a prior-injury standard because they attempt *solely* to set at issue the terms of a *proposed* agreement, to which neither party is a signatory and by which neither party is bound, rather than seeking to have the Court enjoin, or issue a declaration preventing repetition of, these potential harms. Accordingly, the Court finds that there is no controversy under the prior-injury-or-loss standard which applies to a "usual" civil action.

2.

THE DECLARATORY JUDGMENT ACT STANDARD

{87}    A North Carolina court may properly adjudicate a claim brought under the Act where "the plaintiff . . . allege[s] in his complaint and show[s] at the trial, that a real controversy, arising out of the[ parties'] opposing contentions as to their respective legal rights and liabilities under a deed, will or contract in writing, or under a statute, municipal ordinance, contract or franchise, exists between or among the parties, and that the relief prayed for will make certain that which is uncertain and secure that which is insecure." *Carolina Power & Light Co.*, 203 N.C. at 820, 167 S.E. at 61 (citing *Walker*, 202 N.C. 344, 162 S.E. 727). To this end, "it is necessary that litigation appear unavoidable," *Gaston Bd. of Realtors*, 311 N.C. at 234, 316 S.E.2d at 61 (citing *North Carolina Consumers Power,* 285 N.C. at 434, 206 S.E.2d at 178), and that "[m]ere apprehension or the mere threat of an action or a suit is not enough." *Id.* (citing *Newman Machine Co.*, 2 N.C. App. at 494, 163 S.E.2d at 282. Furthermore, "the imminence and practical certainty of the act or event in issue, or the intent, capacity, and power to perform, create justiciability," as distinguished from "remote, contingent, and uncertain events that may never happen and upon which it would be improper to pass as operative facts." *Sharpe*, 317 N.C. at 590, 347 S.E.2d at 32 (quotation, citation, and emphasis omitted).

Lastly, in order to present a justiciable claim under the Act, a plaintiff must show facts to the court sufficient to establish that there is no "impediment to be removed before court action could be started." *City of New Bern*, 328 N.C. at 560, 402 S.E.2d at 625.

{88}     Where the parties to a dispute do not directly invoke the Act, the Court, nevertheless, interprets section 1-256 as providing the authority to adjudicate claims under the Act's less-stringent controversy standard if: (1) the relief sought by the complainant is in the nature of declaratory judgment, and (2) "a judgment or decree will terminate the controversy or remove an uncertainty." §§ 1-253, -256.[28]

{89}     Here, TWEAN has not brought a claim under the Act, and has seemingly foreclosed a direct path to the Act's controversy standard by asserting that "[t]he [r]equirements of the Declaratory Judgment Act [a]re [i]napplicable to an [a]ction [u]nder [s]ection 62-350." (Pl.'s Resp. to Jurisdictional Questions 9.) TWEAN'S statement and corresponding arguments in support thereof, militate in favor of the Court concluding that this matter should be adjudicated under a "non-Declaratory Judgment Act" standard, notwithstanding the prayers of a declaratory nature included in TWEAN's Verified Complaint. *See supra*, ¶ 4; (V. Compl. 15.) However, having already determined that TWEAN's "issues in dispute" are not justiciable under the common law standard, the Court concludes that to the extent that the "issues in dispute" require the declaration of legal rights, it is left to consider application of the less-exacting controversy standard under the Act's general powers of declaration, *see* § 1-253, so long as "a judgment or decree will terminate the controversy or remove an uncertainty." § 1-256.

{90}     TWEAN's pleading of its "issues in dispute" asks the Court to "*specify* a just and reasonable rate or otherwise provide the parties *guidance* on how a reasonable rate should be determined," to "*clarify* that a just and reasonable rate

---

[28] Absent further guidance from our appellate division, the Court rejects the notion that some other legal theory may support the application of the Act's controversy standard to an action brought under the Statute. *See* discussion *supra*, at ¶¶ 64–67.

. . . must be tied to the pole owner's pole-related costs," and to "*declare* Defendant's proposed contract terms governing non-conforming attachments unreasonable." (V. Compl. ¶¶ 44–49 (emphasis added).) The prayed-for relief as to the last of these three issues is, on its face, declaratory in nature; the first and second (to "clarify" and "specify") may also, arguably, amount to requests for the declaration of rights.

{91} Aside from the concerns that naturally arise from TWEAN's request for "guidance," *see Town of Tryon*, 222 N.C. at 204, 22 S.E.2d at 453 (prohibiting issuance of advisory opinions in civil cases), the question of whether, and in what manner, the Court may "specify a just and reasonable rate" in the context of a private agreement between a municipality and a communication service provider also invokes this Court's concerns about the apparent overlap of legislative and judicial functions in the operation of subsection (c) of the Statute. *See* N.C. GEN. STAT. § 62-350(c)(ii)–(iii) (directing the Court to "resolve any dispute identified in the pleadings consistent with the public interest and necessity so as to derive just and reasonable rates, terms, and conditions," and to "apply any new rate adopted as a result of the action."); *State ex rel. Utilities Comm. v. Thornburg*, 325 N.C. 463, 468, 385 S.E.2d 451, 454 (1989) ("[T]he exercise of . . . ratemaking power is a legislative rather than a judicial function [and] such orders are not governed by the principles of res judicata . . . ."); N.C. CONST. Art. I, § 6 ("The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other."). However, having determined that, absent a genuine controversy, the Court lacks subject matter jurisdiction over this matter, the Court does not reach or further address these concerns.

E.

THE COURT'S DETERMINATION OF THE CONTROVERSY ISSUE

{92} While the post-trial briefings of the parties and amici do not directly address the issues that the Court finds determinative in resolving this matter, the Court addresses the most notable of their arguments.

{93} TWEAN's argument that the Statute itself can set forth conditions for bringing suit which, if satisfied, will adequately address the controversy

requirement fails under our case law.  *See Town of Tryon*, 222 N.C. at 205, 22 S.E.2d at 453.

{94} TWEAN's standing arguments also rely on the proposition that our General Assembly may define the controversy required for adjudication, i.e., by conferring standing.  (*See* Pl.'s Resp. to Jurisdictional Questions 6 (citing *Duplin Cnty. Bd. of Educ.*, 201 N.C. App. at 117–18, 686 S.E.2d at 172).)  Yet, the court's opinion in *Duplin Cnty. Bd.* does not inquire into whether a controversy was present;[29] furthermore, the facts of the case reveal a prior injury.  *See Duplin Cnty. Bd.*, 201 N.C. App. at 115, 686 S.E.2d at 170 (recounting that, prior to the onset of litigation, "[d]efendant *adopted* a budget ordinance that *appropriated* to [p]laintiff an amount less than its budget request." (emphasis added)).  The Court also notes that the statutory scheme under which the Duplin County Board of Education's action was brought, on its face requires such prior injurious acts.  *See* N.C. GEN. STAT. § 115C-431 ("If the board of education determines that the amount of money *appropriated* to the local current expense fund, or the capital outlay fund, or both, by the board of county commissioners is not sufficient to support a system of free public schools, the chairman of the board of education and the chairman of the board of county commissioners shall arrange a joint meeting of the two boards to be held within seven days after the day of the county commissioners' decision on the school appropriations." (emphasis added)).  This showing of prior injury, required under section 115C-431 and demonstrated by the Duplin County Board of Education, renders *Duplin County Bd.* inapposite to TWEAN's controversy argument.

{95} The fact that the parties stipulated to the subject matter jurisdiction of the Court in the Pre-Trial Order resulting from their final pretrial conference is also

---

[29] In *Duplin Cnty. Bd.*, "[d]efendant argue[d] that the judgment should be vacated on the grounds that the trial court lacked subject matter jurisdiction *over the parties' controversy.*"  201 N.C. App. at 115, 686 S.E.2d at 170 (emphasis added).  Therefore, defendant only raised, and the *Duplin Cnty. Bd.* court only addressed, procedural standing and constitutional arguments pertaining to justiciability.  *See id.* (discussing defendant's constitutional challenge and defendant's assertion that statutory requirements for bringing suit were not met).

not determinative for the Court.  It is a well-established principle in North Carolina that "[a] party may not waive [subject matter] jurisdiction." *Reece*, 138 N.C. App. at 704, 531 S.E.2d at 882 (citing *Miller*, 212 N.C. 126, 193 S.E. 286).  As a reasonable corollary, parties may not confer subject matter jurisdiction upon a court by agreement or concurrence.

{96}   The Court similarly rejects TWEAN's argument that the Court's prior Order and Opinion decided the question of justiciability when the Court recognized, under the facts as pled, that "either party had the right to exercise its option of bringing an action in Business Court . . . ." *Time Warner Entm't*, 2011 NCBC 19 ¶ 56.  Far from establishing the law of the case regarding the issue of controversy, the Court's statement merely addresses *who* may bring a claim, not whether the factual basis for the claim is sufficient for justiciability.  *See Creek Pointe Homeowner's Ass'n*, 146 N.C. App. at 165, 552 S.E.2d at 225 (quoting *Bremner*, 96 Haw. at 139, 28 P.3d at 355) ("Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issue he wants adjudicated."); *see also Lide*, 231 N.C. at 118, 56 S.E.2d at 409 (rejecting the notion that a statutory expansion of subject matter jurisdiction under the Declaratory Judgment Act could require courts to violate "the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants"); *and Sarda*, 156 N.C. App. at 215, 575 S.E.2d at 831 ("'[i]f a court finds at any stage of the proceedings that it lacks jurisdiction over the subject matter of a case, it must dismiss the case for want of jurisdiction.'" (quoting *Linemann*, 135 N.C. App. at 739, 522 S.E.2d at 785 (citing *Burgess*, 262 N.C. at 465, 137 S.E.2d at 808))).

{97}   Invoking *Mangum*, 362 N.C. at 642–43, 669 S.E.2d at 282–83, TWEAN suggests that "immediate or threatened injury" should form the standard for justiciable controversy.  (Pl.'s Resp. to Jurisdictional Questions 8.)  TWEAN also cites to *Goldston*, 361 N.C. at 30, 637 S.E.2d at 879, in support of the application of an "imminent harm" controversy standard.   (Pl.'s Resp. to Jurisdictional Questions 9.)

{98}    These arguments reflect an incorrect reading of the cited cases and a misperception of the issue before the Court.  In *Mangum*, the Court was called upon to review the trial court's dismissal of the case for lack of *standing* and did not address whether a justiciable controversy was present.  362 N.C. at 642, 669 S.E.2d at 281 ("The sole issue before us is whether petitioners have standing to challenge the issuance of the Special Use Permit.").  TWEAN conflates the "immediate or threatened injury" standard recited as a rule for standing in *Magnum*, with the "imminence and practical certainty" standard for justiciable controversy under the Act.  *Sharpe*, 317 N.C. at 590, 347 S.E.2d at 32; *see also* 362 N.C. at 643, 669 S.E.2d at 282 ("[A] showing of 'immediate or threatened injury' will suffice for purposes of standing." (citations omitted));   In addition, the facts of *Mangum* do not assist TWEAN in advancing its argument.  In *Mangum*, the Raleigh Board of Adjustment had *already approved* the contested rezoning to which the petitioners in that case objected.  *Mangum*, 362 N.C. at 641–42, 669 S.E.2d at 281; *see also City of New Bern*, 328 N.C. at 559, 402 S.E.2d at 625 (holding that where "[t]he city's status was changed by the acts of the general assembly[,] [t]he city was entitled to challenge this change of status by an action for a declaratory judgment.")

{99}    In *Goldston*, unlike *Mangum*, the Court addressed controversy as an issue.  *See Goldston*, 361 N.C. at 33, 637 S.E.2d at 881.  Having abandoned a mandamus prayer for return of previously misappropriated tax revenues, the taxpayer-plaintiffs in *Goldston* proceeded under the Declaratory Judgment Act based solely on "the threat of future illegal and unconstitutional disbursements from the [subject] Trust Fund," which the Court permitted, reversing the trial court's order dismissing the case for *lack of standing*.  361 N.C. at 30, 637 S.E.2d at 879.  In its opinion, however, the four-Justice *Goldston* majority does not refer to any evidence or allegations pertaining to future misappropriations that would make litigation "unavoidable."  By its holding, the Court invites the reasonable inference that prior misappropriations, for which taxpayer-plaintiffs sought no relief whatsoever, formed an adequate controversy.  *Id.* at 33, 637 S.E.2d at 881 ("a taxpayer has standing to bring an action against appropriate government officials

for the alleged [prior] misuse or misappropriation of public funds. Accordingly, plaintiffs were properly before the trial court.").

{100} Without directly explaining why the facts of the case described a sufficient controversy, the *Goldston* court held that "'[a] declaratory judgment should issue "(1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding.""" *Goldston*, 361 N.C. at 33, 637 S.E.2d at 881 (quoting *Augur v. Augur*, 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002) (quoting Edwin M. Borchard, *Declaratory Judgments* 299 (2d ed. 1941) (alterations original))). The Court did not, however, expressly hold that such taxpayer actions may *generally* lie where future harm is speculative or uncertain:

> A declaration as to the legality and constitutionality of the Governor's and the General Assembly's diversions from the Trust Fund may well be the most assured and effective remedy available. If plaintiffs ultimately prevail, their point is made. Similar future diversions will be obviated without requiring that the State undertake substantial and undoubtedly disruptive budgetary gyrations necessary to return immediately the funds at issue. If plaintiffs do not prevail, the Governor and the General Assembly will have done no harm.

*Id.* at 35, 637 S.E.2d at 882 (quotations omitted).

{101} A conservative reading of *Goldston* suggests that its holding should apply only to taxpayer claims brought under the Act. Yet, in a vigorous dissent *on the very issue of controversy*, Chief Justice Parker wrote that "[n]othing in the record . . . suggests that future action by the Governor or the General Assembly would give rise to a controversy rendering litigation unavoidable." *Id.* at 40, 637 S.E.2d at 885 (Parker, C.J. dissenting). Despite the ramifications posed by *Goldston* for judicial controversy doctrine in North Carolina, this Court concludes that the *prior occurrence* in *Goldston* of the very wrong the taxpayer-plaintiffs sought to remedy by preemption of future similar harm distinguishes *Goldston* from any reasonable interpretation of the facts presented in this case. Here, neither

party has advanced allegations of prior harm pertaining to TWEAN's "issues in dispute."

{102} The passage TWEAN quotes from *Goldston*, like the rule Plaintiff cites from *Mangum*, pertains to standing rather than controversy. *See Goldston*, 361 N.C. at 30, 637 S.E.2d at 879 (discussing the requirement of "concrete adverseness" in the context of standing). This reference does little to support Plaintiff's principal argument that (1) "immediate or threatened injury" should be sufficient to define a controversy under the Statute; and (2) the "immediate or threatened injury" described by Plaintiff sufficiently defines the controversy required for this Court to adjudicate TWEAN's "issues in dispute."

{103} Even if this "immediate or threatened injury" standard applied to the controversy question before the Court, TWEAN's argument that Landis' threat to impose a default $50 attachment rate amounts to a controversy is undermined by the Court's findings of fact that no such threat was "imminent" at the filing of this lawsuit, or at the time of trial. *See* finding *supra* ¶ 30.

{104} The Court has previously addressed arguments advanced by Landis or the amici that merely echo TWEAN's contentions that (1) the General Assembly may statutorily define controversy, and (2) a plaintiff's standing alone determines justiciability.

{105} Landis advances the additional, but novel argument that its "'proposed rate' . . . is the actual rate" (Def.'s Supplemental Br. 3.), and that this actual rate, though never charged, is somehow sufficient to create a controversy. Yet, nowhere in the pleadings of this case, or in the evidence at trial, is the Court able to identify a factual or legal basis for this argument. The Court has found as fact that the rate was advanced "for negotiating purposes" and never formally adopted by the Town.

{106} Landis further suggests that the *Town* is the injured party here. The Court notes, however, that Landis has brought no claims against TWEAN in this action. *See* N.C. GEN. STAT. § 62-350(c) (requiring that "[t]he parties shall identify with specificity in their respective pleadings the issues in dispute"). The Court rejects the notion that Landis' purported injury, which was neither pled nor proven

at trial, may provide a sufficient controversy to sustain TWEAN's action under the Statute.

{107} NCCTA's substantive argument is that "a failed commercial negotiation" may establish the controversy required for adjudication. (*See* NCCTA Supplemental Reply Mem. Law 3.); *see also* discussion *supra* ¶ 79. The Court, however, is unaware of any authority to support this notion. In fact, binding case law dictates a contrary result. The seminal case of *Town of Tryon* is instructive on this point. *See Town of Tryon*, 222 N.C. 200, 22 S.E.2d 450 (affirming dismissal for lack of controversy). In *Tryon*, where the parties disputed plaintiff's rights under a contract, the trial court ruled that the allegations in the complaint "did not constitute a declaration of intent on the part of the plaintiff to exercise any rights which it might have under [the contested] section . . . of the defendant's franchise." *Id.* (syllabus). Here, as in *Town of Tryon*, the parties appear to dispute their respective rights under the Statute, but cannot point to conduct admitting of a controversy *with respect to the issues presented for adjudication.*

{108} NCAEC's inventive argument fails for the same reasons. NCAEC attempts to force the square peg of TWEAN's suit into the round hole of controversy by asserting that TWEAN "necessarily has alleged that the challenged rates, terms and conditions at issue had been adopted by Landis at the time this action was commenced." (NCAEC Supplemental Amicus Br. 15.) The pleadings in this case and the transcript of the trial, however, belie any such interpretation of the facts of this case. TWEAN's statement of the "issues in dispute" in the Verified Complaint specifically set out their objection to: "Defendant's *proposed* rental rate of $18.00"; "Defendant's *proposal* to charge . . . the $18 rental rate separately" for each cable attachment; and "Defendant's *proposed* provisions and fines concerning non-conforming attachments." (V. Compl. ¶¶ 44, 46, 48.) Furthermore, TWEAN conceded at the close of trial that "the $18 rate, we found out in the testimony, is not . . . a firm rate." (Trial Tr. 638.)

{109} For the foregoing reasons, the arguments advanced by the parties and amici do not apply to the issues of justiciability that the Court finds determinative.

{110}  Lastly, the Court addresses TWEAN's admonition, in its post-trial briefing, that "[i]f the present dispute is *not* justiciable, [s]ection 62-350 is effectively a dead letter." (Pl.'s Reply Supp. Resp. to Jurisdictional Questions 3.) The Court need not postulate how some other set of facts might establish a controversy sufficient for adjudication under the Statute.  Both parties to this suit have presented the Court with questions that plainly amount to "fish[ing] in judicial ponds for legal advice." *Lide*, 231 N.C. at 117, 56 S.E.2d at 409.  Landis concedes, and TWEAN does not deny, that either party could simply walk away from any adjudication of this case by refusing to be bound.  Thus, to entertain questions regarding whether or not the terms of these parties' *proposed contract* are—or are not—"just and reasonable" would, under these facts, result in "'a purely advisory opinion which the parties might, so to speak, put on ice to be used if and when occasion might arise.'" *Goldston*, 361 N.C. at 36, 637 S.E.2d at 883 (Parker, C.J. dissenting) (quoting *City of Greensboro v. Wall*, 247 N.C. 516, 519, 101 S.E.2d 413, 416 (1958) (quoting *Town of Tryon*, 222 N.C. at 204, 22 S.E.2d at 453)).  "It is no part of the function of the courts, in the exercise of the judicial power vested in them by the Constitution" to do this.  *Poore*, 201 N.C. at 792, 161 S.E. at 533.

{111}  For these reasons, the Court concludes that TWEAN's "issues in dispute" presented for adjudication do not demonstrate a controversy sufficient for the exercise of the Court's subject matter jurisdiction under either (1) the prior-injury standard or (2) the lessened requirement for controversy in a declaratory judgment action.

{112}  Therefore, the Court holds that the three remaining "issues in dispute" advanced by Plaintiff TWEAN against Defendant Landis, relating to the terms of a proposed new pole attachment agreement, fail to confer subject matter jurisdiction upon the court and the same are, therefore, **DISMISSED**, without prejudice.[30]

---

[30] *See Cline v. Teich*, 92 N.C. App. 257, 264, 374 S.E.2d 462, 466 (1988) ("dismissal under [Rule 12]b(1) is not on the merits and thus is not given res judicata effect."(quotation and citation omitted)).

## VI.
## CONCLUSION

{113}  For the reasons stated herein, the Court **DISMISSES**, without prejudice, the three remaining "issues in dispute" advanced by Plaintiff TWEAN against Defendant Landis in the above-captioned case.

**SO ORDERED**, this the 21st day of September, 2012.